## UNITED STATES *v.* WINCHESTER.

1. The admiralty jurisdiction of the district courts of the United States does not extend to seizures made on land.

2. The Abandoned and Captured Property Act of March 12, 1863 (12 Stat. 820), did not repeal the act approved July 17, 1862 (id. 589), entitled "An Act to suppress insurrection, to punish treason and rebellion, to seize and confiscate the property of rebels, and for other purposes."

3. The order of the President for the seizure, under said act of July 17, 1862, of the property of persons engaged in armed rebellion against the United States, or in aiding and abetting the rebellion, is a prerequisite to the exercise by the District Court of its jurisdiction to adjudge the forfeiture and decree the condemnation of such property.

4. Cotton found on land in Mississippi was, Feb. 18, 1863, seized by the naval forces of the United States, without the order of the President, and delivered by an officer of the navy to the marshal of the United States for the Southern District of Illinois. A libel was filed in the District Court for that district, alleging as the ground of seizure that the cotton belonged to a person in armed rebellion against the United States. The cotton was sold, and a decree rendered, whereby one half of the proceeds was paid into the treasury of the United States, and the other half ordered to be paid to the officer as informer, who declined to accept it, and the check therefor was deposited with the assistant treasurer at St. Louis, on whom it had been drawn. At the instance of the admiral, the Supreme Court of the District of Columbia sitting in admiralty took jurisdiction of the case, and ordered the check to be deposited with the assistant treasurer at Washington, and the money to remain in his hands subject to the further order of the court. The check was so deposited, and the court by its decree distributed the money to the captors. *Held*, that the decrees were void, and that the owner of the cotton was entitled to recover the net proceeds of the sale of it.

APPEAL from the Court of Claims.

The facts are stated in the opinion of the court.

*The Attorney-General* for the appellants.

*Mr. Joseph S. Fowler* and *Mr. John Pool, contra.*

MR. JUSTICE FIELD delivered the opinion of the court.

The claimant is the surviving executor of the will of John C. Jenkins, who died in 1855, leaving four minor children, and possessed of a plantation in the State of Mississippi, on the Mississippi River, above Vicksburg. By directions in the will, the plantation was to be cultivated by the representatives of the estate for the benefit of the testator's children.

On the 18th of February, 1863, there was on this plantation belonging to the estate and raised thereon according to the provisions of the will, a quantity of cotton, one hundred and sixty-eight bales of which were on that day seized by the naval forces of the United States, and taken on board of a government steamer. The cotton was then carried to Johnson's Landing, on the river, and thence to Milliken's Bend; where, with other cotton, making in all two hundred and fifty-eight bales, it was shipped on board of the transport "Rowena," by order of Admiral Porter, who was in command of the naval forces on the Mississippi.

In March following, the admiral reported the capture of this cotton to the Secretary of the Navy, and was informed, in reply, that all property captured as "prize property" must be sent to a prize court for adjudication, and be disposed of as the court might decree; and that the disposition of captured "abandoned property" was provided for by an act of Congress of March 12, 1863 The cotton was thereupon sent to Cairo, where it arrived on the 7th of April, 1863, and was delivered to Captain Pennock, commanding at the station, and was by him turned over to the United States marshal of the district. Soon afterwards, upon information given by Captain Pennock, the United States district attorney filed a libel in the District Court of the United States for the Southern District of Illinois for the condemnation and sale of the cotton as forfeited to the United States. The libel stated that the seizure was made by order of Admiral Porter, on the Mississippi River, that river "being a public water of the United States, navigable to the sea by vessels of ten or more tons burden;" and that the seizure was made for violation of the Non-Intercourse Act of July 13, 1861, and the proclamation of the President of Aug. 16, 1861; and because the property belonged to a person in armed rebellion against the government of the United States; and that the case was within the admiralty jurisdiction of the court. The case then proceeded, in accordance with the forms of admiralty practice and entitled as in admiralty, to a decree condemning the property as forfeited to the United States. The decree was subsequently opened as to part of the property, and the libel was amended by striking out the first allegation

us to the Non-Intercourse Act, which was inapplicable to the cotton belonging to the estate of Jenkins and seized on his plantation.

Pending the proceedings, the cotton was sold, and by the decree one half of the proceeds was paid into the treasury, and the other half ordered to be paid to Captain Pennock, as informer, to whom a check for that amount was delivered. Captain Pennock handed the check to Admiral Porter, his superior officer. The admiral, unwilling to receive or keep it as informer, sent it to the Secretary of the Navy, requesting that the money might be distributed among the officers and crews of the Mississippi squadron as captors. The secretary refused to distribute the money, and returned the check to the admiral, and he deposited it with the assistant treasurer at St. Louis, upon whom it was drawn.

Treating the proceedings in the District Court as in admiralty, they are without validity. The admiralty jurisdiction of the District Court extends only to seizures on navigable waters, not to seizures on land. The difference is important, as cases in admiralty are tried without a jury, whilst in cases at law the parties are entitled to a jury, unless one is waived. *United States* v. *Betsey*, 4 Cranch, 443 ; *The Sarah*, 8 Wheat. 391.

But it is contended by the Attorney-General that the proceedings, however loose and defective in form, can be sustained under the Confiscation Act of July 17, 1862, upon the charge that the property was seized as belonging to a person in armed rebellion against the government of the United States. Assuming that upon a vague allegation of this kind, without designation of the owner, and with an erroneous statement in the libel of the place of seizure, a valid decree of condemnation could be rendered under the act of 1862, previous to the passage of the Captured and Abandoned Property Act, it is contended on the part of the claimant that by the passage of this act the provisions for confiscating property, in the act of 1862, are impliedly repealed, as being repugnant to those of the latter act. We do not think so. We agree with the Court of Claims on this point.

The whole scope and purpose of the two acts are different.

The first act provides for the punishment of treason, the seizure, condemnation, and sale of property of persons engaged in the rebellion, and the payment of the proceeds into the treasury, to be applied to the support of the army of the United States. It was directed against persons committing certain overt acts of treason, and against their property. Its object was to punish the persons and to confiscate their property, and contemplated in the latter proceedings equally as in the former the intervention of judicial authority.

The second act was designed to reach all property, with few exceptions, in the insurgent States, seized or taken from hostile possession by the military or naval forces of the United States, whether belonging to friends or enemies, as well as property taken while the owner was voluntarily absent and engaged in aiding or encouraging the rebellion. It provided for a sale of the property thus captured or abandoned without judicial proceedings, and the payment of the proceeds into the treasury, allowing the loyal owner who had never given aid or comfort to the rebellion the privilege of pursuing the proceeds in the Court of Claims. There was also a marked difference in the effect of the proceedings under the two acts. The Confiscation Act authorized proceedings only against the interest of the disloyal owner; the Captured and Abandoned Property Act directed the seizure of the property itself; and its sale carried the title against all claimants. The former also took the property wherever it was found; the latter only in the insurgent States. The former, as respects property, had all the merciless features inseparable from a war measure, and treated as enemies, whose property could be confiscated, all residents within the insurgent States; the latter had this beneficent provision, that it made a discrimination among those whom the rule of international law classes as enemies, in favor of those who, though resident within the hostile territory, maintained in fact a loyal adhesion to the government. The two acts can stand together, and the Confiscation Act be enforced as to all property seized under its provisions. The position of the claimant, as to an implied repeal from a supposed repugnancy of the provisions of the two acts, is not, therefore, tenable.

But upon another ground, apparent upon the face of the

record, the proceedings and decree of the District Court cannot be sustained. There was no previous seizure of the property under any order of the executive; and such seizure was an essential preliminary to give jurisdiction to the court to adjudge its forfeiture and decree its condemnation. The executive seizure is the foundation of all subsequent proceedings under the Confiscation Act. Such is the plain import of the law, and it was so held by this court in *Pelham* v. *Rose*, 9 Wall. 103, and reaffirmed in *The Confiscation Cases*, 20 id. 92. Here the property was seized by the naval forces of the United States upon the notion that being property in the enemies' country, it was subject to capture as a prize of war. The Secretary of the Navy, when informed of the capture, instructed the admiral in command that the disposition of captured abandoned property was provided for by the act of March 12, 1863, evidently regarding the property as coming within that class, if not " prize property." No seizure by executive order is alleged in the libel, for none such was made. The seizure alleged is one made by the naval forces, and even that is stated to have been made at a place other than the plantation of the testator. No validity can be ascribed to a decree by a court which thus never had the property rightfully before it for condemnation. For one-half of the proceeds of the sale paid into the treasury under the decree the claimant is, therefore, clearly entitled to judgment.

As to the remaining half also we have no doubt. The check which Captain Pennock received under the decree of the court, included not only one-half of the proceeds of the claimant's cotton, but of cotton libelled in other cases, amounting in the whole to $59,943.42. The admiral of the squadron to whom Captain Pennock turned over the check, desired, as already stated, that the money should be distributed among the officers and crews of the Mississippi squadron as captors; and when the Secretary of the Navy declined to make the distribution, he deposited the check with the assistant treasurer at St. Louis, upon whom it was drawn. Subsequently, in July 1864, the admiral invoked the aid of the District Court of the District of Columbia to make the distribution, and placed in the hands of the district attorney a certificate stating that the amount

decreed to him as informer, namely, $59,943.42, was on deposit with the assistant treasurer at St. Louis, and expressing his wish as to the distribution of the money, accompanying the certificate with a check for the amount. The District Court took jurisdiction in admiralty of the case, and ordered the check to be deposited by the marshal with the assistant treasurer at Washington, and that the money should remain in his hands subject to the further order of the court. The check was accordingly deposited with the assistant treasurer, and by a subsequent decree the court ordered the money to be distributed as desired, after the payment of certain costs and disbursements incurred in the proceedings.

It is not a question upon which contention can arise that these proceedings of the District Court of the District of Columbia were extra-jurisdictional from beginning to end; and indeed it is apparent from inspection of the decree that the court, assuming as valid the action of the Illinois court, pro ceeded to distribute the money more upon the request of the admiral than upon any authority conferred by law. The decree of distribution signed by the Chief Justice of the District Court shows the kind disposition of a learned magistrate to carry out the generous intentions of a gallant admiral to distribute among the officers and crew under his command money awarded to him as informer, but which he refused to take in that character, without assuming any authority beyond what the admiral implored him to exercise. But as the Illinois court had no jurisdiction to award to the admiral or his captain the money thus generously distributed, we are of opinion that the claimant must have judgment for the amount as well as for the other moiety of the proceeds of the cotton belonging to the estate of his testator.

In the views thus expressed we have merely stated, in brief, the conclusions of the Court of Claims. In the opinion of that court the questions are so fully, clearly, and exhaustively discussed as to leave nothing to be added.

*Judgment affirmed.*