No. 10,718.

## HENRY ET AL. *v.* CARSON.

VENDOR AND VENDEE.—*Deed.—Delivery.—Fraud.*—A deed never delivered, but obtained without the knowledge or consent of the grantor, does not divest the grantor's title, and a subsequent purchaser from the grantee without notice for value will not be protected.

SAME.—*Rescission of Contract.—Notice.—Demand.—Quieting Title.—Complaint.* —C. contracted to sell land to M., a deed to be delivered on payment of a certain instalment of the purchase-money. The deed was prepared and left with C.'s attorney to be delivered on such payment. No payment was ever made, and the deed was not delivered, M. abandoning the purchase. The deed was in some manner improperly obtained and recorded, and there was then a regular chain of conveyances down to H. C. was absent from the country and knew nothing of these transactions. *Held,* that the complaint by C. against H. to quiet title, averring these facts, was good on demurrer.

*Held,* also, that a subsequent suit by C. against M. for the purchase-money, brought by his attorney without his knowledge, resulting in a judgment and the collection of a part of it by said attorney, none of which, however, came to C.'s hands, was not such an affirmance of the contract of sale as would bar the action or require notice of rescission or demand of possession.

JUDGMENT.—*Confiscation.— Void Decree.—Jurisdiction.*—Jurisdiction of proceedings to confiscate property, under the act of Congress of July 17th, 1862, 12 U. S. Statutes at Large, 589, could not exist without a prior seizure of the property by executive order, and this must appear by the record.

SAME.—*Default.*—Where the owner of such property appeared and answered, and his appearance and answer were stricken out and judgment entered by default for the want of an affidavit of his loyalty, the judgment is void.

PRACTICE.—*Evidence.—Harmless Error.*—The admission of irrelevant and immaterial evidence is a harmless error.

From the Madison Circuit Court.

*J. H. Mellett, E. H. Bundy, C. L. Henry* and *H. C. Ryan,* for appellants.

*M. S. Robinson* and *J. W. Lovett,* for appellee.

BICKNELL, C. C.—James Carson brought this suit against Charles L. Henry. The complaint was in two paragraphs. The first was in the statutory form, demanding the possession

of land and damages for its detention. The second averred that the plaintiff, on the 18th of August, 1860, made a contract with Moses Moreland and William Moreland, to sell them the land in controversy and make them a deed therefor on the 25th of December then next, on payment by them of the purchase-money in pursuance of the contract; that plaintiff and his wife, then residents of Tennessee, made and acknowledged a deed for said land, to be tendered to said Morelands on payment of the purchase-money, and placed the same in the hands of the plaintiff's attorney, to be delivered to said Morelands on their payment of said purchase-money, and not otherwise; that said deed was not delivered by said attorney, nor by plaintiff, nor by anybody having authority therefor, either to the said Morelands or to anybody for their use, but was fraudulently obtained by some person unknown, and without any lawful authority was recorded in said county of Madison, thirteen years after its date, without the knowledge of the plaintiff, and that plaintiff never knew of such recording until immediately before the commencement of this suit; that in January, 1865, said Morelands and their wives made a deed for said land to Benjamin F. Alexander, who, with his wife, made a deed therefor to Hardy and Russell, on the 2d of March, 1865; that the deed to said Alexander was not recorded until 1871, and said deed to Hardy and Russell was not recorded until 1876; that on April 2d, 1866, said Russell and his wife conveyed the land to said Hardy by deed recorded in 1868; that on February 4th, 1880, said Hardy conveyed the land to Bailey Davis, who, on December 23d, 1881, conveyed the same to the defendant Henry, who is now in possession thereof; that plaintiff never received any consideration for said deed to the Morelands, who failed to comply with and abandoned said contract, and forfeited all their rights under it, and that said Benjamin F. Alexander, and all claiming under him as aforesaid, took possession of said land without any right and without the plaintiff's knowledge or consent; that in the spring of 1861 the plaintiff removed

from Tennessee to Arkansas, and lived there until August 20th, 1866; that from 1861 to August 20th, 1866, hostilities existed between the United States and the States of Tennessee and Arkansas, as parts of the Southern Confederacy, but plaintiff never renounced his allegiance to the United States, but remained a loyal citizen; that all of the deeds aforesaid are void; that they conveyed no title as against the plaintiff, but are a cloud upon his title. This paragraph prays that plaintiff's title may be quieted, and for all proper relief.

To this complaint Bailey Davis was made a co-defendant on his own petition, which alleged that he was bound to the defendant Henry by covenants of warranty.

The defendants demurred separately to each paragraph of the complaint for want of facts sufficient. These demurrers were overruled. The defendants separately answered the complaint by general denial, and the defendant Henry filed a cross complaint against the plaintiff, claiming to be the owner of the land, and praying that his title be quieted against the plaintiff's claim. The plaintiff answered the cross complaint by a general denial.

The issues were tried by the court, who found for the plaintiff upon the complaint and upon the cross complaint, with $360 damages against the defendant Henry, and that said deed to the Morelands was never delivered, and that it and all the subsequent deeds aforesaid were a cloud upon the plaintiff's title, which ought to be removed.

The defendants moved for a new trial, alleging thirteen reasons therefor. This motion was overruled. Judgment was rendered pursuant to the finding. The defendants appealed.

The errors assigned are overruling the demurrers to each paragraph of the complaint, and overruling the motion for a new trial.

The appellants admit in their brief that the first paragraph of the complaint was good, and we think the second paragraph was also good. The averments of that paragraph being admitted by the demurrer, the deed to the Morelands was

never delivered, but was fraudulently obtained and put on record by some unknown person thirteen years after its date, the plaintiff knowing nothing about it until immediately before suit brought; it was, therefore, no better than a forged deed recorded under the same circumstances, the party defrauded being ignorant of the forgery until immediately before his suit brought for relief. There was no error in overruling the demurrers to the several paragraphs of the complaint.

The first four causes for a new trial are, substantially, that the finding is not sustained by the evidence and is contrary to law.  •

The evidence is in some respects conflicting, but it appeared clearly that the appellee was the owner of the land in controversy, and that the defendant claimed it under certain deeds as alleged in the complaint, and that the plaintiff, in 1860, was living in Tennessee and moved thence to Arkansas, in May, 1861, where he has lived ever since; that the plaintiff, by his brother and attorney in fact, who lived in Ohio, had given the Morelands a bond for a deed, reciting a sale of the land by the appellee to the Morelands for $3,500, payable, $100 in advance, $900 on December 25th, 1860, $1,000 on December 25th, 1861, $750 on December 25th, 1862, and $750 on December 25th, 1863, with interest after December 25th, 1860, which payments were secured by notes of the Morelands; that the bond was conditioned for the execution of a deed to the Morelands on payment of the purchase-money as above, and that after the payment of the $900 due December 25th, 1860, the Morelands should have possession of the land.

There was evidence tending to show that the Morelands were unable to make the payment of $900 on December 25th, 1860, and were then notified that they could not expect possession of the land until they complied with their contract in that respect; that the appellee then left the notes and deed with his attorneys, with instructions to carry out the contract

and deliver the deed to the Morelands if the payment should be made; that nothing was ever paid to the appellee for the land except said advance payment of $100, and that he never gave authority to anybody to deliver the deed, except the above conditional authority, to his attorneys, and never gave the Morelands authority to take possession of the land, and never knew they had so taken possession, until the day before the trial of this suit; that the appellee, after the failure of the Morelands to pay the $900 due December 25th, 1860, returned to Tennessee; that in May, 1861, he removed to northeastern Arkansas, where he has lived ever since; that appellee was never able to come to Indiana to look after the land; that he wrote to several attorneys of Indianapolis, who declined to act without money; that he wrote to his own attorneys but received no information from them; that the appellee received by mail a notice of proceedings in the United States District Court at Indianapolis, for the confiscation of said notes, which notice required him to appear on February 1st, 1864, but was not received by him until several months after that date, and that he never made any further inquiry about the land, "because he thought that Uncle Sam had got hold of it;" that it was confiscated by the United States, and he never knew it was not confiscated until about two months before the trial of this suit.

It appeared by a transcript of said confiscation proceedings, that the property attempted to be confiscated was a judgment in the Madison Circuit Court in favor of the appellee against said Morelands, at April term, 1861, for $917.60, with a credit thereon of $500, and two notes against the same parties, one due December 25th, 1862, and the other due December 25th, 1863, and that the alleged cause of confiscation was, that the appellee had been engaged in aiding and abetting the Rebellion. The transcript showed that the information was filed January 17th, 1863, and that afterwards a monition was issued requiring the marshal to attach the property and detain it until the further order of the court, and to give notice, etc.,

and that said monition was returned on January 20th, 1863, with a return of the marshal showing a seizure of the property. The transcript showed that the affidavit, on which the information was founded, was made by the said Moses Moreland, on January 14th, 1868, who swore that the appellee was in open rebellion, but there was evidence tending to show that this affidavit was false, and that the appellee was all the time loyal to the United States.

The transcript further showed that the amount of the indebtedness confiscated was $3,550, which was ordered to be sold, and was sold to James Smith for $202, which was applied as follows: For marshal's costs $51.36; for clerk's costs $54; for docket fee $20; and that the remainder was applied in other cases against another party, and that a certificate of purchase was issued to the said James Smith, who was engaged in the clerk's office of said district court.

There was also evidence tending to show that the Morelands took possession of the land in the spring of 1861, and held it until 1864; that they had the bond in their possession until 1864, and that it was then given to other parties; that in July, 1863, one of the attorneys of the appellee, with whom the deed and notes had been left by the appellee, was served with a *subpœna duces tecum*, requiring him to produce the same in said district court; that in obedience to said subpœna he took the deed and notes to the court, and was directed by the then judge of said court to deliver them to deputy marshal Bigelow, as the safest person with whom they could be left; that he left them with said Bigelow to be used in court, if necessary; that he tried to get them afterwards from said Bigelow, but never got them; that said attorneys appeared for Carson in said confiscation proceedings, and filed an answer for him, which was stricken out for want of an affidavit; that they never gave notice of the confiscation proceedings to the appellee, because they concluded they could not reach him with a notice.

It appeared that the confiscated indebtedness was ordered to be sold at the court-house in Anderson, and there was evidence tending to show that on the day of sale the Morelands went to Anderson intending to have a friend to buy in the notes for them, but although they were there from 9 o'clock A. M. until 3 o'clock P. M. of the day of sale, they could not find the parties making the sale until after the sale had been made.

It further appeared that in February, 1864, the Morelands sold their interest in the land to Alanson E. Russell, who was to take the land and pay the Morelands $1,000, and assume their obligations, and that at Russell's request the Morelands made a deed for the land to Benjamin F. Alexander, who took possession of the land in the spring of 1864, and that Russell at that time had never seen any bond or deed from the appellee to the Morelands, and Russell testified that the bond was never assigned to him. It appeared that the bond was finally found at Indianapolis, in the clerk's office of the district court, about two months before the trial of the present suit, and the notes were also there. It appeared that said Russell and Joseph O. Hardy bought the land afterwards from said Alexander, and had possession of it, and then Hardy bought out Russell and took possession of the land in 1866, and sold it to Bailey Davis in 1880, who sold it to the defendant Henry in 1881.

It also appeared that in February, 1865, said Joseph O. Hardy went to Indianapolis and there procured from said deputy marshal Bigelow the deed from Carson to the Morelands, which had been left with him for safe-keeping, to be used in court, if necessary, in the confiscation proceedings, and that said Hardy kept said deed in his safe and did not put it on record until 1873, and that the deed from the Morelands to Alexander, although dated in January, 1865, was not put on record until September, 1871; that the deed from Alexander to Hardy and Russell, although dated in March, 1865, was not put on record until May, 1876; that

the deed from Russell to Hardy, although dated in April, 1866, was not put on record until February, 1868, and that the deeds from Hardy to Davis, and from Davis to Henry, were recorded in proper time. The evidence showed that no formal demand of possession was made upon the defendant Henry, although he was informed by the appellee's attorney that he was about to commence suit for the appellee to recover the land. There was evidence tending to show that although the deed and notes were left with the appellee's attorneys for a specific purpose, and not for suit, yet some of them were put in suit, and money was collected on one of them by execution, but that this was without the knowledge of the appellee, and that no part of said money ever came to his hands. The appellants claim that the evidence shows they were innocent purchasers for value, not chargeable with fraud; that the deed from Carson to the Morelands was improperly delivered, because of the carelessness and negligence of the appellee's agent, and that the long silence of the appellee from 1865 until 1882 will estop him from asserting any claim to the land.

They claim, secondly, that the confiscation proceedings were regular, and that after the confiscation the appellee had no interest either in the purchase-money or the land; that his title to the indebtedness was divested, and thenceforward he had no further interest in the land; that it makes no difference whether the appellee was loyal or not, nor whether he had or had not notice of the confiscation proceedings.

They claim, thirdly, that there has never been any rescission of the contract; that the appellee, on the default of the Morelands, elected to maintain suits for the purchase-money, thereby affirming the contract, and depriving himself of the right to complain of Moreland's possession of the land, and that, even if not so estopped, he could not recover the land without a formal notice of rescission and a demand of possession.

But the evidence tends to show that the Morelands were

wrong-doers from the beginning; they were not vendees put in possession by the vendor, and they had not the rights of such vendees; they were not to have possession until they paid the $900; they refused to pay it; they took possession wrongfully without paying it, and they thereby gained no rights which would entitle them to a demand of possession before suit brought. *Kratemayer* v. *Brink*, 17 Ind. 509. The appellants' third ground of objection to the plaintiff's recovery is applicable only to cases where the vendee is lawfully in possession under the contract. The Morelands not only went into possession without authority, but they promoted the confiscation proceedings founded on the false affidavit of one of them, and the fair inference from the testimony is that their object was to buy in the indebtedness, and were only prevented therefrom by the proceedings of the court subordinates, which enabled Smith, one of their number, to become the purchaser at $202. We think the evidence tends to show an abandonment of the contract, equivalent to a rescission of it. *Fowler* v. *Johnson*, 19 Ind. 207; *Shirley* v. *Shirley*, 7 Blackf. 452.

It is not true that the deed from Carson to the Morelands was improperly delivered by the negligence of the appellee's agents; it was never delivered to the Morelands at all. When the plaintiff's agent, in obedience to a *subpœna duces tecum*, brought said deed to the U. S. District Court, and was directed by the judge of said court to leave it with the deputy marshal, to be used if necessary as evidence in the pending suit, there was no negligence in the agent in obeying that direction, nor in afterwards unsuccessfully demanding from the deputy the return of the deed.

The deputy's wrongful acts in refusing to return the deed to the appellee's agent, and in delivering it to Hardy without authority from the appellee, and the fact that Hardy, in his attempt to secure the land for himself, took said deed and put it in his safe and kept it there eight years without recording it, do not show any negligence in the appellee, and can

not affect his title, and the long silence of the appellee, from 1865 to 1882, he being a non-resident and ignorant of all the aforesaid contrivances, can not, under the circumstances detailed in the evidence, injuriously affect his rights. He commenced this suit within two or three months after he became acquainted with the facts. The questions as to the regularity and the effect of the confiscation proceedings will be considered hereafter.

The appellee proved his title; he made a deed to the Morelands to be delivered to them upon condition; the condition was never fulfilled. The Morelands took possession of the land wrongfully; their bond for a deed as well as the unexecuted deed of Carson to them, and also the evidences of their indebtedness to Carson, were all in the possession of the deputy marshal and others at the clerk's office of the United States District Court. The deed was never delivered to the Morelands; it was procured by Hardy from the deputy marshal, kept in his safe from 1865 to 1873, and was then recorded.

In the meantime the Morelands had made a deed to Alexander in January, 1865, which was recorded in 1871. Alexander had made a deed to Hardy and Russell in March, 1865, recorded in 1876. Russell had made a deed to Hardy in 1866, recorded in 1868, and all of these conveyances, except the last one, were made and received before Hardy got possession of the deed from the appellee to the Morelands, and they were all made without any delivery of that deed to the Morelands, and without anything on record in the recorder's office indicating that the appellee's title therein shown had been parted with. It can not be pretended that any of these conveyances deprived the appellee of his title. Hardy knew all the time that there had been no delivery by the appellee to the Morelands of his deed to them, but finally, in 1873, he put that deed on record, and in 1880 conveyed the land to Davis, who, in 1881, conveyed it to Henry. There was evidence tending to show that Henry and Davis were

purchasers for value, but the facts in relation to the non-re-cording of the previous deed were apparent on the records, and, even without such facts, their title would seem to be no better than if the deed to the Morelands had been forged and put on record.

If a grantee gets possession of the deed surreptitiously on any other terms than by fulfilling the condition, there has been no delivery with the assent of the grantor, and the title could not be conveyed. *Harkreader* v. *Clayton,* 31 Am. R. 369.

A deed, delivered without the knowledge, consent or ac-quiescence of the grantor, is no more effectual to pass title to the grantee than if it were a total forgery, although the in-strument may be spread upon the record, and innocent pur-chasers are not protected. *John* v. *Hatfield,* 84 Ind. 75 ; Pom. Eq. Jur. 735, 779, 807, 821 ; Bigelow Fraud, 156 ; *Austin* v. *Dean,* 40 Mich. 386 ; *Ramsey* v. *Riley,* 13 Ohio, 157 ; *Van Amringe* v. *Morton,* 4 Whart. 382. These cases show that even if the appellants purchased in good faith for a valuable consideration and without notice, such facts will not avail against the appellee, his equities are at least equal to those of the appellants, and in equal equities the legal title prevails.

As to the confiscation proceedings, it may be observed that the United States had no authority, under the Constitution, to confiscate the land of the appellee, even if he had been a traitor, for any longer period than during his life ; and it may be observed further that in this case the land was not confiscated ; the indebtedness only was confiscated. The sug-gestion of the appellants that when the indebtedness was con-fiscated, the appellee thereby lost his land, can not be sus-tained. But it is not necessary here to determine what would be the effect of regular proceedings in confiscation, because the confiscation proceedings in this case were clearly irregu-lar, and were of no validity even against the indebtedness.

These were proceedings to take private property for public use, without compensation, and, therefore, on general princi-ples, must be strictly construed. The United States District

Court is a court of limited jurisdiction; its jurisdiction, therefore, must appear on the face of the proceedings. *Galpin* v. *Page*, 18 Wall. 350; *McCarty* v. *State*, 16 Ind. 310; *Justice* v. *State*, 17 Ind. 56; *Cobb* v. *State*, 27 Ind. 133. And when it has acquired jurisdiction its powers must be strictly pursued.

The power to confiscate the property of rebels in the loyal States arises upon the act of July 17th, 1862, 12 U. S. Statutes at Large, 589.

The doctrine that when a court has once acquired jurisdiction, it has a right to decide every question which arises in the cause, and that its judgment, however erroneous, can not be collaterally assailed, " is only correct when the court proceeds, after acquiring jurisdiction of the cause, according to the established modes governing the class to which the case belongs, and does not transcend, in the extent or character of its judgment, the law which is applicable to it." *Windsor* v. *McVeigh*, 93 U. S. 274. The same rule has been otherwise expressed as follows : " Jurisdiction having attached in the original case, everything done within the power of that jurisdiction, when collaterally questioned, is to be held conclusive of the rights of the parties, unless impeached for fraud." *Cornett* v. *Williams*, 20 Wall. 226.

Therefore, even if the district court of the United States had acquired jurisdiction in the case under consideration, its record shows upon its face that its judgment was unauthorized by law. It shows that, after notice by publication, the appellee appeared by his attorneys and filed an answer, and that his appearance and answer were stricken out, and judgment was rendered against him by default. The pretext for this was that there was no affidavit of the appellee's loyalty. The effect of the ruling was that although an alleged traitor, when prosecuted, was entitled to a notice requiring him to appear, yet if he should appear he could not be heard in defence. In *McVeigh* v. *U. S.*, 11 Wall. 259, the proceedings were similar. There the defendant's answer was stricken from

the files, and he was defaulted because he was a resident of Richmond, within the Confederate lines, and was a rebel. The Supreme Court, on a writ of error, reversed the judgment below, and Mr. Justice SWAYNE, delivering the opinion of the court, said: " The district court committed a serious error in ordering the claim and answer of the respondent to be stricken from the files. As we are unanimous in this conclusion, our opinion will be confined to that subject. The order in effect denied the respondent a hearing. It is alleged that he was in the position of an alien enemy, and hence could have no *locus standi* in that forum. If assailed there, he could defend there. The liability and the right are inseparable. A different result would be a blot upon our jurisprudence and civilization. We can not hesitate or doubt on the subject. It would be contrary to the first principles of the social compact and of the right administration of justice." This was on error. The same question came up when the same judgment was collaterally attacked in an action of ejectment, in the case of *Windsor* v. *Mc Veigh*, 93 U. S. 274. Mr. Justice FIELD, delivering the opinion of the court, said: " It was not within the power of the jurisdiction of the district court to proceed with the case, so as to affect the rights of the owner after his appearance had been stricken out. * * For jurisdiction is the right to hear and determine; not to determine without hearing. And where, as in that case, no appearance was allowed, there could be no hearing or opportunity of being heard, and, therefore, could be no exercise of jurisdiction. By the act of the court, the respondent was excluded from its jurisdiction."

The foregoing cases show that the aforesaid confiscation proceedings were of no avail against the appellee, even if jurisdiction had originally been properly obtained.

The appellee insists that jurisdiction was never obtained by the district court, because the record fails to show any seizure of the property under executive order before the filing of the information. This point seems to be well made. In *United*

*States* v. *Winchester*, 99 U. S. 372, the court said: "But upon another ground, apparent upon the face of the record, the proceedings and decree of the district court can not be sustained. There was no previous seizure of the property under any order of the executive; and such seizure was an essential preliminary to give jurisdiction to the court to adjudge its forfeiture and decree its condemnation. The executive seizure is the foundation of all subsequent proceedings under the confiscation act. Such is the plain import of the law, and it was so held by this court in *Pelham* v. *Rose*, 9 Wall. 103, and reaffirmed in *The Confiscation Cases*, 20 *id.* 92."

In the case last cited from 20 Wallace, it was held that where the information avers that on a day named a seizure was made by the marshal under the proper executive authority, and where, after a monition founded on such information, default has been made, it will be presumed, after final judgment and condemnation, that the requirements of the confiscation act, which direct that a seizure be made prior to filing the information, and that this seizure be by order of the President of the United States, have been complied with. But the information under consideration in the case at bar, contains no such averments and fails to show any such seizure, nor is any such seizure shown in any part of the record of the confiscation proceedings.

We have now disposed of the first four reasons for a new trial. The fifth, sixth, seventh, eighth and ninth reasons for a new trial are waived, not being discussed in the appellants' brief. The tenth, eleventh, twelfth and thirteenth reasons for a new trial, present as errors the action of the court in permitting the appellee to answer questions in reference to his loyalty to the United States during the war of the Rebellion.

The bill of exceptions shows that the objection to each of these questions was that "it is not competent for the witness to contradict the record of the district court of the United States, the record having been introduced by the plaintiff, and because the questions are irrelevant and immaterial."

The appellee was seeking to show a fraudulent combination to deprive him of his property by colorable confiscation proceedings which were in fact absolutely void, and although it be conceded that he failed to make the fraud fully appear, the matter objected to was admissible as part of the testimony tending in that direction. In a certain sense the testimony was immaterial and irrelevant, because the loyalty or disloyalty of the plaintiff could not affect his title to the land, but, regarded as irrelevant and immaterial, the admission of it was a harmless error which could have no effect on the result of the suit, and will not warrant a reversal of the judgment    *Wayne County Turnpike Co.* v. *Berry,* 5 Ind. 286; *McDermitt* v. *Hubanks,* 25 Ind. 232.

The judgment ought to be affirmed.

Per Curiam.—It is therefore ordered, on the foregoing opinion, that the judgment of the court below be and the same is hereby in all things affirmed, at the costs of the appellants.

Filed Feb. 13, 1884. Petition for a rehearing overruled June 25, 1884.