618 F.2d 453
 UNITED STATES of America, Plaintiff-Appellee,
v.
ONE 1976 MERCEDES BENZ 280S, SERIAL NO. 11602012072193,
Wisconsin License No. Q55-103, its tools and
appurtenances, by its owner Larry R.
Rogers, Defendant-Appellant.
 No. 79-1517.
 United States Court of Appeals,
Seventh Circuit.
 Argued Nov. 9, 1979.
Decided March 25, 1980.
 
 Robert E. Sutton, Milwaukee, Wis., for defendant-appellant.
 James M. Fergal, Asst. U. S. Atty., Milwaukee, Wis., for plaintiff-appellee.
 Before SPRECHER and CUDAHY, Circuit Judges, and DUMBAULD, Senior District Judge.*
 DUMBAULD, Senior District Judge.
 This case involves the forfeiture of a motor vehicle, a 1976 Mercedes-Benz 280-S, allegedly used in connection with the transportation of narcotics. The pertinent statute under which the Government proceeded is 21 U.S.C. 881, which provides (with inapplicable exceptions for common carriers and stolen vehicles) that:
 (a) The following shall be subject to forfeiture to the United States and no property right shall exist in them.
 (4) All conveyances, including aircraft, vehicles, or vessels, which are used, or intended for use, to transport, or in any manner to facilitate the transportation, sale, receipt, possession, or concealment of (unlawfully distributed narcotics).[1]
 In many cases forfeiture is a harsh and oppressive procedure, depriving innocent owners of their property because it was used by other persons for unlawful purposes; and courts have strained to avoid unjust results. U. S. v. One 1976 Lincoln Mark IV, 462 F.Supp. 1383, 1387, 1389, 1392 (W.D.Pa.1979). The seemingly harsh rule which permits condemnation of the vehicle without regard to the owner's culpability, is explained by the fact that historically forfeiture is a civil proceeding in rem. The vehicle or other inanimate object is treated as being itself guilty of wrongdoing, regardless of its owner's conduct. Gelston v. Hoyt, 3 Wheat. 246, 291, 312-20, 4 L.Ed. 381 (1818); The Palmyra, 12 Wheat. 1, 14-15, 6 L.Ed. 531 (1827); Goldsmith-Grant Co. v. U. S., 254 U.S. 505, 510-13, 41 S.Ct. 189, 190-191, 65 L.Ed. 376 (1921); U. S. v. One Ford Coupe, 272 U.S. 321, 332-33, 47 S.Ct. 154, 158, 71 L.Ed. 279 (1926); U. S. v. U. S. Coin & Currency, 401 U.S. 715, 719-21, 91 S.Ct. 1041, 1043-44, 28 L.Ed.2d 434 (1971);[2] Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 680-88, 94 S.Ct. 2080, 2090-94, 40 L.Ed.2d 452 (1974); U. S. v. One 1962 Ford Thunderbird, 232 F.Supp. 1019, 1021-22 (N.D.Ill.E.D.1964). See also Holmes, The Common Law (1881); Grotius, De Jure Belli ac Pacis, Bk. 1, c. 17, 21; Exodus 21:28. Distress for collection of taxes or other debts to the Government was another harsh proceeding sanctioned by history. In Murray's Lessee v. Hoboken Land & Improvement Co., 18 How. 272, 276-80, 15 L.Ed. 372 (1856), it was held that due process of the law of the land permitted that summary mode of collection.[3]
 Under the statutes involved here automobiles have been forfeited because of use "to facilitate" narcotics sales even though the drugs were not physically transported in the car; use of the vehicle to transport a drug peddler to and from the place of advance payment has been held sufficient. 462 F.Supp. at 1388. Hence forfeiture in the case at bar could be sustained upon the ground of facilitation alone; but, as will be seen, the Government here makes out a stronger case.
 As the District Court found, "It is reasonable to believe that the controlled substances Mr. Heflin sold to Agent Stacy were transported in the automobile." The owner, Larry Rogers, may have himself on May 2, 1977, driven the actual seller, Elliott Heflin, to the Marc Plaza hotel in Milwaukee in the car (at least he was a passenger in it, and with another man waited in the car outside the hotel until Heflin returned from making the narcotics sale) while Heflin got out of the vehicle, entered the hotel, completed a sale of cocaine to Agent Thomas Stacy in the hotel lounge, and then returned to the car, got in, and the three men drove off.
 On a later occasion the same modus operandi was employed. On May 23, 1977, Agent Stacy bought $1700 worth of heroin from Heflin at the Gas-Lite Lounge in Milwaukee. Again agents staked out at the site saw the Mercedes approach, and Heflin get out of the car, enter the lounge, shortly return, and re-enter the vehicle, which drove away. In the course of the telephone conversation arranging the rendezvous on May 23, Heflin told Agent Stacy that his source was wealthy and drove a Mercedes-Benz.
 Under the circumstances appearing in the present record, it is difficult to feel sympathy for the owner of the Mercedes-Benz as an innocent bystander, having no significant involvement in the criminal enterprise, and suffering unjustly as a victim of the severe consequences entailed by a traditional legal doctrine. This is particularly true when it is noted that Rogers was himself duly arrested pursuant to a warrant on August 30, 1978, and a routine inventory search incident to his arrest[4] disclosed the presence of cocaine and marihuana in the Mercedes-Benz. This constitutes a separate and independent ground for sustaining the forfeiture. Cooper v. California, 386 U.S. 58, 61-62, 87 S.Ct. 788, 790-791, 17 L.Ed.2d 730 (1967); Chimel v. California, 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685 (1969); South Dakota v. Opperman, 428 U.S. 364, 369-76, 96 S.Ct. 3092, 3097-3100, 49 L.Ed.2d 1000 (1976).
 Hence Rogers cannot be regarded as an innocent victim of a harsh rule of law. He himself was substantially involved in drug traffic. It would be difficult to believe that on three occasions he had no knowledge of the use of his vehicle to facilitate narcotics transactions.
 It is reasonable to conclude, as the District Court did, that on the occasions when Heflin traveled in the car (on the first occasion in company with Rogers) to effect sales to Agent Stacy, Heflin carried the drugs on his person while en route to the lounges where the sales took place. The time was short, on both occasions, between his leaving the car to enter the lounge, and his return after completion of the sale. It is true that the agents did not search him before he entered the lounge, or keep him constantly in sight while he was in transit from the car to the lounge, and back to the car. But it is highly improbable that he twice obtained drugs from anyone other than his acknowledged source during those brief interludes. Moreover, when the car was searched incident to the arrest of Rogers, drugs were found in the car, even if one accepts the hypothesis that no drugs were transported in the car during Heflin's trips to meet Stacy. In any event the Mercedes-Benz was used to "facilitate" drug dealings.
 Thus there is sufficient evidence from which a jury might reasonably find that a forfeiture occurred, especially when it is remembered that in such a civil proceeding in rem the claimant has the burden of proof.[5] Unfortunately, however, the District Court did not impanel a jury to pass upon the facts in the case at bar, although timely demand for jury trial was made by the owner of the vehicle. And although this seems to be a case of first impression with respect to such a demand, and we have been able to find no cases precisely in point (perhaps because forfeiture is usually sought simultaneously with criminal prosecution and is not contested because the evidence of guilt is clear), we are constrained to conclude, after careful consideration of relevant authorities, that in a forfeiture proceeding such as this the owner of the vehicle is entitled to the right to trial by jury.
 The Seventh Amendment, upon which any constitutional right to jury trial in civil cases depends,[6] provides:
 In suits at common law, where the value in controversy shall exceed twenty dollars,[7] the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law. (Italics supplied)
 It should be noted that the Seventh Amendment created no new right to jury trial but merely preserves the right to jury trial in cases where it was enjoyed under pre-existing law.[8]
 This proposition, self-evident from the wording of the Amendment, has been recognized from the beginning in Supreme Court decisions. Perhaps the earliest discussion of the constitutional language was that of the celebrated Justice Joseph Story, sitting in the old Circuit Court for the District of Massachusetts, in U. S. v. Wonson, Fed.Cas.No. 16,750, 1 Gall. 5 (1812): "Beyond all question, the common law here alluded to is not the common law of any individual state, (for it probably differs in all), but it is the common law of England, the grand reservoir of all our jurisprudence." (28 Fed.Cas. at 750, 1 Gall. 5) The same eminent jurist declared in Parsons v. Bedford, 3 Pet. 433, 446-47, 7 L.Ed. 732 (1830): "The trial by jury is justly dear to the American people. . . . The phrase 'common law', found in this clause, is used in contradistinction to equity, and admiralty and maritime jurisprudence." Suits "at common law" were "suits in which legal rights were to be ascertained and determined, in contradistinction to those where equitable rights alone were recognised, and equitable remedies were administered; or where, as in the admiralty, a mixture of public law, and of maritime law and equity, was often found in the same suit. . . . In a just sense, the amendment then may well be construed to embrace all suits, which are not of equity and admiralty jurisdiction, whatever may be the peculiar form which they may assume to settle legal rights."
 It was well known that there was no right to jury trial in equity or admiralty cases, but only in proceedings "at common law." The boundaries of equity and admiralty, however, were often fluctuating and uncertain.[9] Partly this was because there were separate tribunals administering those areas of law, and (since litigation then brought revenue to the courts handling it and the maxim boni judicis est ampliare jurisdictionem prevailed) there was intense competition between the common law courts and their rivals for available business. The equity or chancery court was presided over by the Lord Chancellor, who in early times was usually an ecclesiastical dignitary, and as "keeper of the king's conscience" undertook to mitigate the rigor and strictness of common law rules by an infusion of ethical and moral standards more adequate to the exigencies of right and justice. Later, equity itself became more rigid and comprised certain traditional rubrics, such as reformation or specific performance of contracts, injunctions, trusts, and the like.[10] One cardinal principle of equity, however, was that equitable relief was available only in the absence of an adequate remedy at law;[11] hence the liberalization of legal remedies meant a narrowing of the scope of equity.[12]
 Although Coke lost in his quarrel with the court of chancery,[13] the common law courts succeeded in restricting admiralty jurisdiction.[14] The limitations in force in England have been departed from in the United States; one noteworthy modernization of admiralty jurisdiction was its extension to inland lakes[15] and navigable rivers.[16]
 It should be noted also that Congress is free to fashion new types of remedy, such as a special equity court or an administrative tribunal, where jury trial may validly be withheld. NLRB v. Jones & Laughlin, 301 U.S. 1, 48-49, 57 S.Ct. 615, 629, 81 L.Ed. 893 (1937);[17] Curtis v. Loether, 415 U.S. 189, 195, 94 S.Ct. 1005, 1008, 39 L.Ed.2d 260 (1974); Atlas Roofing Co. v. Occupational Safety Comm'n, 430 U.S. 442, 450-55, 97 S.Ct. 1261, 1266-1269, 51 L.Ed.2d 464 (1977);[18] Rosenthal & Co. v. Bagley, 581 F.2d 1258, 1261 (C.A. 7, 1978). But if Congress simply creates a new statutory right (without providing a special statutory proceeding for enforcement) and relegates parties to their common law remedies (such as a civil action for collection of a sum certain, such as a tax[19] or penalty,[20] a proceeding akin to the old action of debt at common law) then the ordinary common law remedy carries with it its ordinary incident of jury trial.[21]
 Our inquiry in the case at bar therefore is a historical[22] investigation, whether under English and American practice,[23] proximately prior to December 15, 1791,[24] trial by jury was utilized in civil proceedings in rem for enforcement of statutory forfeitures in violation of customs laws or other statutes; or whether, on the other hand, such a proceeding fell within the scope of equity or admiralty, where jury trial was traditionally unavailable.
 It is difficult to imagine how a proceeding to enforce a statutory forfeiture can resemble in any respect a suit in equity.[25] But how stands the matter with respect to admiralty? The simple truth seems to be that the proceeding is in admiralty when the seizure to which it relates takes place on water; but that when the seizure takes place on land it is a suit at common law.
 It was Chief Justice John Marshall who first enunciated this proposition, so consonant with the logical common sense that characterized his legal reasoning.[26] In The Sarah, 8 Wheat. 391, 394, 5 L.Ed. 644 (1823), the celebrated Chief Justice wrote:
 By the act constituting the judicial system of the United States, the district courts are courts both of common-law and admiralty jurisdiction. In the trial of all cases of seizure, on land, the court sits as a court of common law. In cases of seizure made on waters navigable by vessels of ten tons burden and upwards, the court sits as a court of admiralty. In all cases at common law, the trial must be by jury. In cases of admiralty and maritime jurisdiction, it has been settled[27] . . . that the trial is to be by the court.
 It is interesting to note that in fact a jury had been sworn in the case, and had found a verdict for the United States. But the Supreme Court held that this procedure was "irregular;" and that an admiralty court completely lacks jurisdiction of a case involving a seizure made on land. "The court for the Louisiana district was sitting as a court of admiralty; and when it was shown, that the seizure was made on land, its jurisdiction ceased . . . and any proceeding of the court, as a court of admiralty, after the fact that the seizure was made on land appeared, would have been a proceeding without jurisdiction." (8 Wheat. at 394-95).
 On remand, the pleadings were amended, and a jury trial had on the exchequer side of the district court. The verdict was for the claimants; and judgment in their favor was affirmed upon writ of error in an opinion by Justice Story. U. S. v. 422 Casks of Wine, 1 Pet. 547, 550, 7 L.Ed. 257 (1828).
 
 
 1
 These two adjudications by the Supreme Court relating to wine shipped on the brig Sarah seem to furnish conclusive authority in favor of jury trial in cases of forfeiture where the seizure is made on land.
 
 
 2
 The often praised original Judiciary Act of 1789[28] (more correctly entitled An Act to Establish the Judicial Courts of the United States) to which Marshall referred, became law on September 24, 1789,[29] and provided in section 9:
 
 
 3
 That the district courts shall have . . . exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction, including all seizures under laws of impost, navigation or trade of the United States, where the seizures are made, on waters which are navigable from the sea by vessels of ten or more tons burthen, within their respective districts as well as upon the high seas; saving to suitors, in all cases, the right of a common law remedy, where the common law is competent to give it; and shall also have exclusive original cognizance of all seizures on land, or other waters than as aforesaid, made, and of all suits for penalties and forfeitures incurred, under the laws of the United States. . . . And the trial of issues in fact, in the district courts, in all causes except civil causes of admiralty and maritime jurisdiction,[30] shall be by jury.[31]
 
 
 4
 Even before establishing the judicial courts and most of the executive departments,[32] the first Congress gave attention to collection of customs duties and provided for penalties and forfeitures in case of violations. Section 36 of the Act of July 31, 1789, 1 Stat. 29, 47-48[33] prescribed the mode of prosecuting and recovering penalties and forfeitures.
 
 
 5
 Goods seized by virtue of the act was to remain in the custody of the collector of customs "until such proceedings shall be had, as by this act are required, to ascertain whether the same have been forfeited or not." (Section 25, 1 Stat. 43). Such proceedings are described in section 36. All penalties accruing by any breach of the act "shall be sued for and recovered" in the name of the United States by the collector. "And all ships or vessels, goods, wares and merchandise, which shall become forfeit by virtue of this act, shall be seized, libelled and prosecuted as aforesaid, in the proper court having cognizance thereof."[34] The court must give 14 days' public notice, and if no claimant appears within that time, the property "shall be adjudged to be forfeited; but if any person shall appear before such judgment for forfeiture," and claim it, giving bond to prosecute, "the court shall proceed to hear and determine the cause according to law."
 
 
 6
 The section likewise provided that: "And when any prosecution shall be commenced on account of the seizure of any (such property), and judgment shall be given for the claimant or claimants; if it shall appear to the court before whom such prosecution shall be tried, that there was a reasonable cause of seizure, the same court shall cause a proper certificate or entry to be made thereof, and in such case the claimant shall not be entitled to costs, nor shall the person who made the seizure, or the prosecutor be liable to action, judgment or suit, on account of such seizure or prosecution." Section 27 provides that "the onus probandi shall be upon (the) claimant."[35] It should be noted that "probable cause", in cases of forfeiture, means that the seizure was made "under circumstances which warrant suspicion." Locke v. U. S., 7 Cranch 339, 348, 3 L.Ed. 364 (1813).
 
 
 7
 Hence it must be concluded that several procedural aspects preserved in present law regarding forfeitures constitute vestiges of "old, forgotten, far-off things and battles long ago." Thus the present rules set forth in 19 U.S.C. 1615 that "the burden of proof shall be upon (the) claimant" provided that "probable cause shall be first shown for the institution of such suit or action (for the forfeiture of any vehicle), to be judged of by the court" go back to the original customs act of 1789 (as amplified in 1799) or even earlier.
 
 
 8
 As described by Julius Goebel, exoneration from liability for tortious seizure if the court makes a determination of probable cause goes back to the Sugar Act, 4 Geo. III c. 15, for the protection of customs officers in the Colonies. And the resolutions of the Continental Congress of October 14, 1774, included in their protest against acts of Parliament "subversive of American rights" those which "authorise the judges certificate to indemnify the prosecutor from damages, that he might otherwise be liable to."[36]
 
 
 9
 Thus, far from constituting authority for non-jury trial of forfeiture cases, as argued in appellee's brief (p. 5), the language of 19 U.S.C. 1615 merely preserves an ancient protection safeguarding the seizing or prosecuting official from an action of trespass for damages for tortious seizure if he loses the forfeiture case. (See Gelston v. Hoyt, 3 Wheat. 246, 314, 320, 4 L.Ed. 381 (1818)). 19 U.S.C. 1615 does not relate at all to the mode of trial to be observed in a forfeiture case; it relates merely to the consequences of the outcome of such trial.
 
 
 10
 In view of the foregoing provisions of the first customs act and of the first Judiciary Act, both enacted in 1789 by the first Congress, it seems clear that Marshall's construction of section 9 of the Judiciary Act is correct, and that the statute is constitutional when it allocates seizures on water to the admiralty jurisdiction.[37] In any event, even though the line of cases on which Marshall relies[38] has been criticized (by Justices Daniel, Woodbury, and Campbell, as well as by Chancellor Kent[39]) it is significant for present purposes that the criticism was not directed to that branch of the rule which requires jury trial for seizures on land, but attacked the inclusion of revenue seizures on navigable waters as an unwarranted extension of admiralty jurisdiction when made above the ebb and flow of the tide or within the body of a county.[40]
 
 
 11
 This can be demonstrated by a brief examination of Attorney General Charles Lee's argument in The Betsey and Charlotte. Lee had been losing counsel in La Vengeance,[41] which he thought had been hastily decided without adequate consideration.[42] He was permitted to reargue the point de novo in The Betsey and Charlotte.[43] His contention was that "cases of admiralty and maritime Jurisdiction" as referred to in Art. III, sec. 2, cl. 1, of the Constitution included only the ancient and traditional admiralty jurisdiction as recognized in England at the time of adoption of the Constitution; and that forfeitures for violation of customs or navigation laws were not an inherent part of the jurisdiction of the admiralty but an extraneous or adventitious accretion by virtue of English acts of Parliament.[44] If admiralty jurisdiction as understood in Art. III, sec. 2, cl. 1, of the Constitution was confined to the extent of admiralty jurisdiction recognized in England, it would be unconstitutional for Congress to entrust to American admiralty courts extraneous matters such as "seizures under laws of impost, navigation or trade . . . on waters . . . navigable from the sea by vessels of ten or more tons burthen."[45] Lee also argued that "including" in section 5 of the Judiciary Act meant "and also" or "as well as." Hence, the items enumerated after "including" were matters in addition to admiralty matters, and were not included within admiralty jurisdiction.[46]
 
 
 12
 Lee was undoubtedly correct in stating that under English law before 1791 seizures not within admiralty jurisdiction were handled by the Court of Exchequer, as a proceeding at common law, with trial by jury.[47] This historical fact is of controlling significance for the case at bar. Its correctness is attested to by Chief Justice Stone's scholarly opinion in C. J. Hendry Co. v. Moore, 318 U.S. 133, 137-40, 63 S.Ct. 499, 501-503, 87 L.Ed. 663 (1943), and many other authorities.[48]
 
 In Hendry the Court said:
 
 13
 The common law as it was received in the United States at the time of the adoption of the Constitution did not afford a remedy in rem in suits between private persons. . . . But to the generalization that a judgment in rem was not a common law remedy there is an important exception. Forfeiture to the Crown of the offending object, because it had been used in violation of law, by a procedure in rem was a practice familiar not only to the English admiralty courts but to the court of Exchequer. The Exchequer gave such a remedy for the forfeiture of articles seized on land for the violation of law. . . . Such suits in the Exchequer were begun on information and were against the vessel or article to be condemned. . . .
 
 
 14
 Separate courts exercising the jurisdiction of the Court of Exchequer were never established in the American Colonies. Instead, that jurisdiction was absorbed by the common law courts which entertained suits for the forfeiture of property under English or local statutes authorizing its condemnation. Long before the adoption of the Constitution the common law courts in the Colonies and later in the states during the period of Confederation were exercising jurisdiction in rem in the enforcement of forfeiture statutes. Like the Exchequer, in cases of seizure on navigable waters they exercised a jurisdiction concurrently with the courts of admiralty. But the vice-admiralty courts in the Colonies did not begin to function with any real continuity until about 1700 or shortly afterward. . . . By that time, the jurisdiction of common law courts to condemn ships and cargoes for violation of the Navigation Acts had been firmly established, apparently without question, and was regularly exercised throughout the colonies. In general the suits were brought against the vessel or article to be condemned, were tried by jury, closely followed the procedure in Exchequer, and if successful resulted in judgments of forfeiture or condemnation with a provision for sale.
 
 
 15
 The Court has never held or said that the admiralty jurisdiction in a forfeiture case is exclusive, and it has repeatedly declared that, in cases of forfeiture of articles seized on land for violation of federal statutes, the district courts proceed as courts of common law according to the course of the Exchequer on informations in rem with trial by jury. The Sarah, 8 Wheat. 391, 396, n. A, 5 L.Ed. 644; 443 Cans of Egg Product v. United States, 226 U.S. 172, 33 S.Ct. 50, 57 L.Ed. 174, and cases cited. In United States v. 422 Casks of Wine, 1 Pet. 547, 7 L. Ed. 257, Justice Story defined such an action as a libel or information in rem on the Exchequer side of the court. And see Chief Justice Marshall's reference, in Schooner Hoppet v. United States, 7 Cranch 389, 393, 3 L.Ed. 380, to "proceedings in Courts of common law, either against the person or the thing, for penalties or forfeitures." In all this we perceive a common understanding of judges, lawyers and text writers, both before and after the adoption of the Constitution, of the common law nature of the procedure and judgment in rem in forfeiture cases and of its use in such proceedings in the Exchequer and in the American common law courts. (318 U.S. at 137, 139-40, 153, 63 S.Ct. at 501-510, italics supplied.)
 
 
 16
 A well-known instance of the contrast between the procedure in England at common law in the Exchequer Court, with trial by jury, and that imposed by Parliament upon the Colonies by extending the admiralty jurisdiction and thus depriving Americans of the cherished right to jury trial,[49] appears in the eloquent argument prepared by John Adams in behalf of John Hancock, the wealthy Massachusetts patriot and smuggler who as President of the Continental Congress affixed the familiar bold signature which adorns the parchment Declaration of Independence.[50]
 
 
 17
 Adams cogently emphasized that the Sugar Act of 1764, 4 Geo. III, c. 15 in section 40 specifically provided that forfeitures in England should be sued for in any court of record (meaning, in practice, the Exchequer); whereas in section 41, applying to America, there were added the words "or in any court of admiralty, in the said colonies or plantations where such offence shall be committed, or in any court of vice admiralty which may or shall be appointed over all America . . . at the election of the informer or prosecutor." In the eloquent words of Adams: "Here is the contrast that stares us in the face! The Parliament in one Clause guarding the People of the Realm, and securing to them the Benefit of Tryal by the Law of the land, and by the next Clause, depriving Americans of that Privilege. What shall we say to this distinction? Is there not in this Clause, a Brand of Infamy, of Degradation, and Disgrace, fixed upon every American? Is he not degraded below the Rank of Englishman?"[51] As the learned editors of the Adams Papers remark, this discrimination "deprived Hancock of the right to trial by jury, a defect all the more grievous because comparable offenses in England were to be tried to a jury in the Exchequer."[52]
 
 
 18
 Further corroboration regarding the pre-1791 practice is found in Charles Warren's researches into the drafting of the Judiciary Act:
 
 
 19
 An interesting addition to the District Court jurisdiction was made by another amendment. The Draft Bill gave "exclusive original cognizance of all civil causes of admiralty and maritime jurisdiction, including all seizures under laws of impost, navigation or trade of the United States, where the seizures are made on waters which are navigable by (sic ) the sea by vessels of ten or more tons burthen, within their respective districts, as well as upon the high seas." In view of the extreme fears expressed by opponents of the Federal system lest the right of jury trial should be impaired, the jurisdiction thus granted to the District Courts, in the clause beginning with the words "including all seizures," was extraordinary. For in England, the admiralty jurisdiction did not extend to such "seizures under laws of import (sic), navigation or trade," which, consequently, were triable, in that country, in a common law Court by a jury. Although in some of the Colonies, trials of such cases had been had in the Colonial Admiralty Courts without jury, it seems curious that the framers of this Bill should have deliberately included such cases of seizure within the admiralty jurisdiction of the new Federal Courts and should thus have deliberately enlarged the scope of such Courts and consequently the scope of trials without jury, beyond the scope then existent in England. But such was the effect of the phraseology of this portion of the Act, as the Supreme Court later held, Judge Samuel Chase saying that "the reason for putting seizures of this kind in admiralty side of the Court was the great danger to the revenue if such cases should be left to the caprice of juries" a rather insufficient explanation, in view of the insistence on jury trial shown by the Congress throughout other portions of the Act. But while jurisdiction over such seizures on the seas was given by the Draft Bill to the District Courts sitting in admiralty, no jurisdiction over seizures by the Federal Government made elsewhere than on the high seas was vested in any Federal Court, and hence such cases were left entirely to the State Courts. The Senate, however, now added greatly to the scope of Federal jurisdiction by inserting the following words: "and shall also have exclusive original cognizance of all seizures on land, or other waters than as aforesaid, made, and of all suits for penalties and forfeitures incurred, under the laws of the United States." These cases, however, were not included within the admiralty jurisdiction of the District Court, but were left as suits at common law to be tried by a jury.
 
 
 20
 The anxiety to preserve the right of jury trial was shown by the insertion by the Senate, at the end of Section 9 of the Act: "and the trial of issues in (sic ) fact in the District Court, in all causes, except civil causes of admiralty and maritime jurisdiction, shall be by jury."[53]
 
 
 21
 Moreover, random scrutiny of the reports of decisions of the Exchequer discloses routine use of juries. For example, in Mitchell v. Torup, Parker 227, 145 English Reprint 764 (Hilary term, 1766), a ship was forfeited under the Navigation Act, 12 Car. II c. 4, because 221 pounds of tea were smuggled into England from Norway "but (as the jury found in a special verdict) without the knowledge, privity or consent of the master, mate or owners, of the said ship or vessel." (Parker, 229). The plaintiff qui tam seized the ship, and prosecuted for the king and himself. The court held that in the statute "there is not a syllable that hints at the privity or consent of the master, mate or owners." The Court continued, "The reason of penning the clause in these strong terms is to prevent as much as possible its being evaded, for if the privity or consent of the master, mate or owners had been made necessary to the forfeiture, it would have opened a door for perpetual evasion and the provisions of this excellent act for the increase of the navigation would have been defeated." (Parker, 232-33).[54]
 
 
 22
 And in Attorney General v. Roote, 3 Anstruther 726, 145 Eng.Rep. 1020 (Trinity term, 1796), "After a verdict for the Crown" the court upheld the forfeiture of a cutter licensed to engage in the oyster fishery between the Isle of Wight and Spurn Point but seized (within her licensed limits) after a voyage to Hamburgh. The Chief Baron declared that the license specifies the area within which navigation of the vessel is confined; "as soon as she goes out of those limits her licence is gone, and she is as liable to be seized as if she had none." See also Attorney General v. Le Merchant and others, 1 Anstr. 52, 145 E.R. 797 (Pasch.1792); Attorney General v. Munn, Parker 91, 145 E.R. 723 (Hil.1748); Attorney General v. Brown, 3 Anstr. 720, 145 E.R. 1018 (Trin.1797).[55]
 
 
 23
 The conclusion appears inescapable that both English and American practice prior to 1791 definitely recognized jury trial of in rem actions at common law as the established mode of determining the propriety of statutory forfeitures on land for breach of statutory prohibitions.
 
 
 24
 The practice has remained uniform in American decisions, from The Sarah to Hendry. Some intermediate cases may be mentioned by way of illustration. In U. S. v. The Queen, Fed.Cas. No. 16,107, 4 Ben. 237 (S.D.N.Y.1870), Judge (later Mr. Justice) Blatchford held that recovery of a statutory penalty against the master of the vessel for illegal importation of merchandise "must be enforced by a suit at common law, and that he is entitled in that to a trial by jury;" but that the liability of the vessel under an 1866 law that the vessel shall be holden for the payment of penalties to which the master is subject may be enforced in admiralty.[56]
 
 
 25
 Judge Blatchford cited Union Ins. Co. v. U. S., 6 Wall. 759, 764, 18 L.Ed. 879 (1868), where the Supreme Court construed the Civil War confiscation act of August 6, 1861, 12 Stat. 319, as requiring, in cases of seizures on land under the peculiar wording of the statute[57] that "the proceeding must be in general conformity to the course in admiralty; but issues of fact, on the demand of either party, must be tried by jury" (citing The Sarah ).
 
 
 26
 In the Confiscation Cases, 7 Wall. 454, 462, 19 L.Ed 196 (1869), under the same confiscation statute, the Court said: "Where the seizure was made on navigable waters, the case belongs to the instance side of the subordinate court; but where the seizure was made on land, the suit is one at common law, and the claimants are entitled to a trial by jury" (citing The Sarah ).
 
 
 27
 In Morris's Cotton, 8 Wall. 507, 511, 19 L.Ed. 481 (1869), the Court reaffirmed the rule that "all seizures on land or on waters not navigable, and all suits instituted to recover penalties and forfeitures incurred, except for seizures on navigable waters, must be prosecuted as other common-law suits, and can only be removed into this court by writ of error."
 
 
 28
 In Garnharts v. U. S., 16 Wall. 162, 165, 21 L.Ed. 275 (1873), involving forfeiture of distilled spirits on which tax had not been paid, seized on land, the Court states: "Where the seizure is made on land, the claimant is entitled to a trial by jury, if he appears and files an answer denying the facts set forth in the information" (citing The Sarah and Confiscation Cases ).
 
 
 29
 In U. S. v. Winchester, 99 U.S. 372, 374, 25 L.Ed. 479 (1879), it was said by Justice Field:
 
 
 30
 "The admiralty jurisdiction of the District Court extends only to seizures on navigable waters, not to seizures on land. The difference is important, as cases in admiralty are tried without a jury, whilst in cases at law the parties are entitled to a jury, unless one is waived" (citing The Sarah and The Betsey and Charlotte ).
 
 
 31
 Of more recent vintage is 443 Cans of Frozen Egg Product v. U. S., 226 U.S. 172, 180-83, 33 S.Ct. 50, 52, 57 L.Ed. 257 (1912), where the dichotomy proclaimed in Marshall's opinion in The Sarah was again quoted and followed. Likewise during the "noble experiment" of Prohibition, under the Eighteenth Amendment, Justice Cardozo held, in General Motors Corp. v. U. S., 286 U.S. 49, 56-58, 52 S.Ct. 468, 470-471, 76 L.Ed. 971 (1932), that the time-honored remedy of forfeiture of vehicles bearing smuggled goods could be utilized concurrently with other measures directed specifically against intoxicating liquors.
 
 
 32
 And just a few years ago the late Judge Alexander Lawrence wrote that "In proceedings by the Government under the customs statutes the federal court sits as a court of common law and issues of fact are determinable by a jury." U. S. v. One (1) Douglas A-26B Aircraft, 436 F.Supp. 1292, 1298 (S.D.Ga., Savannah Div. 1977). This statement is dictum since no demand for jury trial had been made and the case was disposed of on motion for summary judgment.
 
 
 33
 Professor James W. Moore of Yale in his familiar treatise Moore's Federal Practice (2nd ed. 1948, looseleaf pages 1979) vol. 5, paragraph 38.12(7), pp. 135, 137, and paragraph 38.31 (1), pp. 231-32, expresses the view that for seizures on land jury trial is available (citing Hendry and The Sarah ).
 
 
 34
 And finally, in this Circuit, in Rogers v. Loether, 467 F.2d 1110, 1123 n. 44 (C.A. 7, 1972), aff'd sub nom. Curtis v. Loether, 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974), Judge (now Mr. Justice) John Paul Stevens states that "Except in admiralty, forfeiture cases are triable to a jury." Hendry and Moore's treatise are cited in support of the statement.
 
 
 35
 The issue involved in Loether was whether a jury trial was required under 42 U.S.C. 3612(c), which provides that "The court . . . may award to the plaintiff actual damages and not more than $1,000 punitive damages . . ." With respect to such punitive damages Judge Stevens says: "Certainly it is highly unusual for a federal statute to authorize a court to impose punishment, even if limited to $1,000,[58] without according the defendant the right to a jury trial." Footnote 44 is appended to support that conclusion, and begins by stating that "A court of equity would not enforce a penalty or forfeiture absent a specific statutory authorization" (citing Livingston v. Woodworth, 15 How. 546, 559-60, 14 L.Ed. 809 (1854); and Stevens v. Gladding, 17 How. 447, 453-54, 15 L.Ed. 155 (1855)). Then, parenthetically, comes the comment that, except in admiralty, forfeiture cases are triable to a jury (citing Hendry and Moore's treatise).
 
 
 36
 The footnote reference does appear to be a part of the substratum supporting the decision of the issue facing the court in Loether, namely whether 42 U.S.C. 3612 should be interpreted as contemplating trial by jury as a condition precedent to an "award" of punitive damages by the court. Thus the parenthetical statement in footnote 44 seems to be more than obiter dictum, even though the controlling consideration in reaching the court's ultimate decision was the desire to avoid grave constitutional doubts, and the court did not have occasion to pass squarely on the constitutional issue of jury trial in the case of statutory forfeitures on land, the issue directly confronting us in the case at bar.
 
 
 37
 We are satisfied that the unbroken chain of acceptance of the land/water dichotomy extending from the original Judiciary Act of 1789 and Chief Justice Marshall's holding in The Sarah, through the authoritative exposition by Chief Justice Stone in Hendry, to the collateral recognition of the rule by Justice Stevens in a footnote in Loether, warrants us in declining to depart from the settled practice unless we are instructed differently by the decision of a higher court.
 
 
 38
 Regrettably our conclusion may add to the caseload of the federal court system and require additional time in trying forfeiture cases. But ordinarily forfeiture proceedings are instituted in connection with criminal prosecutions arising out of the same transactions, and under modern procedures it should be practicable for the same jury to dispose of the civil and criminal proceedings concurrently and upon the same evidence. The fact that one facet of the case is in rem and the other in personam, that the burden of proof rests on different parties and is to be determined under a different standard, should cause no confusion if clear and adequate instructions are given by the trial court.
 
 
 39
 But in any event, mere inconvenience would be insufficient reason for denying a traditional and substantial constitutional right. Curtis v. Loether, 415 U.S. 189, 198, 94 S.Ct. 1005, 1010, 39 L.Ed.2d 260 (1974); Pernell v. Southall Realty, 416 U.S. 363, 383-85, 94 S.Ct. 1723, 1733-1734, 40 L.Ed.2d 198 (1974); Goldberg v. Kelly, 397 U.S. 254, 265-66, 90 S.Ct. 1011, 1019, 25 L.Ed.2d 287 (1970).
 
 
 40
 Moreover, even as a matter of policy, weight must be given to the time-honored tradition of American commitment to jury trial, extending back to the Continental Congress (and, as was then believed, to the legale judicium parium in Magna Carta).[59] Americans reading Blackstone's statement that "trial by jury ever has been, and I trust ever will be, looked upon as the glory of the English law"[60] rejoiced that even greater reverence was accorded to that cherished institution in the future kingless commonwealths of the new world. The strength of this national policy was recognized, as has been seen, by Justice Story, himself an advocate for extensive admiralty jurisdiction, when in Parsons v. Bedford he declared: "The trial by jury is justly dear to the American people. It has always been an object of deep interest and solicitude, and every encroachment upon it has been watched with great jealousy. . . . One of the strongest objections originally taken against the constitution of the United States, was the want of an express provision securing the right of trial by jury in civil cases. As soon as the constitution was adopted, this right was secured by the seventh amendment . . . which received an assent of the people, so general, as to establish its importance as a fundamental guarantee of the rights and liberties of the people."[61] Jury trial "ranks high in our catalogue of constitutional safeguards," according to a more recent defender of democratic institutions, the late Justice Hugo Black. He regarded the jury as "the constitutional tribunal provided for trying facts in courts of law," and declared that "The founders of our government thought that trial of fact by juries . . . was an essential bulwark of civil liberty." Toth v. Quarles, 350 U.S. 11, 16, 76 S.Ct. 1, 5, 100 L.Ed. 8 (1955); Berry v. U. S., 312 U.S. 450, 453, 61 S.Ct. 637, 638, 85 L.Ed. 945 (1941); Galloway v. U. S., 319 U.S. 372, 397, 63 S.Ct. 1077, 1090, 87 L.Ed. 1458 (1943).
 
 
 41
 Furthermore, in the particular type of proceeding here involved, the infusion of the earthy common sense of a jury might upon occasion mitigate appropriately the harsh impact sometimes characteristic of in rem procedure, as discussed at the outset of this opinion.
 
 
 42
 Both history and policy thus constrain us to conclude that this case must be remanded for jury trial.
 
 
 43
 Remanded for further proceedings in accordance with this opinion.
 
 
 44
 SPRECHER, Circuit Judge, dissenting.
 
 
 45
 Regretfully I must dissent from the majority opinion, reached with such Herculean effort.
 
 
 46
 * This is a statutory forfeiture or personal property condemnation proceeding commenced by the United States subject to 21 U.S.C. § 881 and 49 U.S.C. § 782. The United States seized an automobile on August 10, 1978 and instituted this action on December 5, 1978 for its forfeiture. An evidentiary hearing was held on February 12, 1979 and based upon that hearing, the district court granted the government's complaint for forfeiture and condemnation. The automobile involved is a 1976 Mercedes Benz four-door owned by Larry Rogers (owner). The owner has appealed.
 
 II
 
 47
 On May 2, 1977, an agent of the Drug Enforcement Administration (DEA), Thomas Stacy, arranged to purchase cocaine from Elliot Heflin. The meeting was arranged through Michael Weston, to take place at the Marc Plaza Hotel in Milwaukee, Wisconsin. The meeting took place at about 7:00 p. m. on May 2, 1977 and Agent Stacy purchased a quantity of cocaine from Heflin.
 
 
 48
 On May 2, 1977, while Agent Stacy waited for Heflin inside the Marc Plaza, DEA agents Michael P. Ebert and William Malone were staked out near the Marc Plaza and observed the subject green Mercedes Benz, Wisconsin license number Q55-103, pull up in front of the hotel. Heflin got out of the car and went into the hotel at about 7:00 p. m., which was approximately the same time Agent Stacy met with Heflin. Two men remained in the green Mercedes Benz, Larry Rogers and an unknown person. At approximately 7:30 p. m., Heflin returned to the Mercedes Benz, got in, and the automobile drove away.
 
 
 49
 On May 23, 1977, Agent Stacy arranged another meeting with Heflin. During the telephone conversation, Heflin told Agent Stacy that his source was wealthy and drove a Mercedes Benz. Agent Stacy met Heflin at the Gas-Lite East Lounge in Milwaukee and purchased a brown substance for $1,700. The substance was later tested and identified as heroin.
 
 
 50
 On May 23, 1977, Agent Ebert was again on duty and situated about one-half block from the Gas-Lite Lounge. At about 2:00 p. m., he saw a green Mercedes Benz, Wisconsin license number Q55-103, park near the lounge. Heflin got out of the automobile and went into the lounge. Agent Ebert also saw Heflin exit the lounge and get into the same automobile.
 
 
 51
 On August 30, 1978, Larry Rogers, among others, was arrested and his automobile was seized. An inventory search was conducted and quantities of cocaine and marijuana were found in the green Mercedes Benz owned by Rogers.
 
 III
 21 U.S.C. § 881 provides in part:
 
 52
 (a) The following shall be subject to forfeiture to the United States and no property right shall exist in them:
 
 
 53
 (1) All controlled substances which have been manufactured, distributed, dispensed, or acquired in violation of this subchapter.
 
 
 54
 (4) All conveyances, including aircraft, vehicles, or vessels, which are used, or are intended for use, to transport, or in any manner to facilitate the transportation, sale, receipt, possession, or concealment of property described in paragraph (1) . . . .
 
 
 55
 (d) All provisions of law relating to the seizure, summary and judicial forfeiture, and condemnation of property for violation of the customs laws . . . shall apply to seizures and forfeitures incurred, or alleged to have been incurred, under the provisions of this subchapter, insofar as applicable and not inconsistent with the provisions hereof . . . .
 
 
 56
 In accordance with § 881(d), 19 U.S.C. § 1615 applies:
 
 
 57
 In all suits or actions . . . brought for the forfeiture of any vessel, vehicle, merchandise, or baggage seized under the provisions of any law relating to the collection of duties on imports or tonnage, where the property is claimed by any person, the burden of proof shall lie upon such claimant; and in all suits or actions brought for the recovery of the value of any vessel, vehicle, merchandise, or baggage, because of violation of any such law, the burden of proof shall be upon the defendant: Provided, That probable cause shall be first shown for the institution of such suit or action, to be judged of by the court . . . .
 
 
 58
 The conclusion laboriously reached by the majority is undoubtedly correct: "that both English and American practice prior to 1791 definitely recognized jury trial of in rem actions at common law as the established mode of determining the propriety of statutory forfeitures on land for breach of statutory prohibitions." The difficulty comes in applying that principle to the present case.
 
 IV
 
 59
 The record on appeal does not contain a written jury demand and the district court docket sheet does not reflect either the making of a jury demand or its disposition by the court. A hearing was held by the court on February 12, 1979, but the record does not contain a transcript of that hearing.
 
 
 60
 The record does contain a "memorandum in opposition" by the government filed on January 5, 1979, which refers to a demand for jury trial by the owner and briefly responds to that demand by praying that it be denied. The owner filed a brief on January 30, 1979, prior to the hearing, and another brief on March 13, after the hearing, and in neither one does he even mention his claim that he was entitled to a jury trial. Under all these circumstances, if the owner was entitled to a jury trial, he had certainly waived that right.
 
 
 61
 But there is a more fundamental reason why he is not so entitled. In a forfeiture proceeding involving goods seized on land, the Supreme Court, speaking through Mr. Justice Story in Taylor v. United States, 44 U.S. (3 How.) 197, 211, 11 L.Ed. 559 (1845), said:
 
 
 62
 The main exception however to the charge is as to the ruling of the judge that there was probable cause of seizure, and that, therefore, the onus probandi to establish the innocence of the importation, and to repel the supposed forfeiture, was upon the claimants. We entirely concur in the opinion of the judge, in his views of the evidence as applicable to this point. He, and not the jury, was to judge whether there was probable cause or not to throw the onus probandi on the claimants; for the 71st section of the act of 1799, chap. 128, expressly declares that "the onus probandi shall lie on the claimant only where probable cause is shown for such prosecution, to be judged of by the court before whom such prosecution is to be had."
 
 
 63
 A year later the Supreme Court reiterated this view in Buckley v. United States, 45 U.S. (4 How.) 251, 259, 11 L.Ed. 961 (1846), another case involving goods seized on land, saying:
 
 
 64
 The exceptions taken to the evidence having been disposed of, we proceed to examine such as were taken to the charge of the court. The first, that the court had undertaken to determine from the evidence that there was probable cause for the seizure, without submitting it to the jury, was abandoned in the argument. This court had ruled in Taylor v. The United States, 3 How. 211, that the judge, and not the jury, was to determine whether there was probable cause, so as to throw on the claimant the onus probandi to establish the fairness of the importation.
 
 
 65
 These two Supreme Court cases make it clear that the jury trial is necessary when demanded only after the issue of probable cause has been decided by the court without a jury. In the present case the district judge issued a Memorandum and Order on April 23, 1979, containing his findings of fact and conclusions of law, which make it clear that the owner "Mr. Rogers . . . at the hearing . . . presented no evidence." In a memorandum to the court after the hearing, the government noted:
 
 
 66
 It is not insignificant that the defendant did not come forth with any evidence to dispute the Government's proof.
 
 
 67
 Replying to that memorandum, the owner conceded that he did not offer any proof. Therefore under Taylor and Buckley, the government's evidence establishing probable cause was required to be heard by the court without a jury, and the owner offered no proof whatsoever to be heard by a jury.
 
 
 68
 The principle of Taylor and Buckley remains codified in the present language of 19 U.S.C. § 1615 that probable cause shall be judged by the court.
 
 
 69
 Under these circumstances, once probable cause was shown and the burden of proof shifted to the owner and he offered no proof, the government was entitled to judgment as a matter of law. In light of this fact, reversal is unwarranted in this case either because the owner could not complain of a deprivation of a jury trial, Page v. Work, 290 F.2d 323, 334 (9th Cir.) cert. denied, 368 U.S. 875, 82 S.Ct. 121, 7 L.Ed.2d 76 (1961), there being no issue to try to a jury, or because, at worst, any error in refusing a jury trial constituted harmless error not justifying a retrial. King v. United Benefit Fire Ins. Co., 377 F.2d 728, 731 (10th Cir.), cert. denied, 389 U.S. 857, 88 S.Ct. 99, 19 L.Ed.2d 124 (1967).
 
 
 70
 I would therefore affirm the judgment granting the government's complaint for forfeiture and condemnation.
 
 
 
 *
 The Honorable Edward Dumbauld, Senior District Judge of the Western District of Pennsylvania, sitting by designation
 
 
 [1]
 49 U.S.C. 782 is also invoked, providing that "Any . . . vehicle . . . which has been or is being used in violation of (narcotics laws) or in, upon, or by means of which any violation . . . has taken or is taking place, shall be seized and forfeited." This section refers specifically to past use, while 21 U.S.C. 881(a)(4) stresses also future intended use
 
 
 [2]
 Language in that case that "When the forfeiture statutes are viewed in their entirety, it is manifest that they are intended to impose a penalty only upon those who are significantly involved in a criminal enterprise" (401 U.S. at 721-22, 91 S.Ct. at 1044-45) was seized upon by courts straining to avoid the harshness of the traditional rule (see 462 F.Supp. at 1392), but that ray of hope was extinguished in Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 680, 688, 94 S.Ct. 2080, 2090, 2094, 40 L.Ed.2d 452 (1974). See also U. S. v. One Clipper Bow Ketch Nisku, 548 F.2d 8, 11 (C.A. 1, 1977)
 
 
 [3]
 See also Wickwire v. Reinecke, 275 U.S. 101, 105-106, 48 S.Ct. 43, 44-45, 72 L.Ed. 184 (1927); Helvering v. Mitchell, 303 U.S. 391, 402, 58 S.Ct. 630, 634, 82 L.Ed. 917 (1938); Cheatham v. U. S., 92 U.S. 85, 88, 23 L.Ed. 561 (1876); Springer v. U. S., 102 U.S. 586, 593, 26 L.Ed. 253 (1881). (Acknowledgment is gratefully made to Roger F. Jacobs, Librarian of the Supreme Court, for his courteously supplying from records available in Washington, the dates of decision of cases cited between 1 Howard (42 U.S.) and 17 Otto (107 U.S.). During that period the reports merely indicate the term of court. It would be a substantial service to the profession and an appropriate project for one of the organizations celebrating the forthcoming bicentennial of the Constitution if a table or other convenient means of ascertaining dates of decisions during that period were published.)
 
 
 [4]
 The prosecution against Rogers was dropped before trial. Thus no collateral estoppel arose regarding the facts involved in the forfeiture proceedings, as would have been the case in the event of an acquittal. Cf. Coffey v. U. S., 116 U.S. 436, 442-43, 6 S.Ct. 437, 440, 29 L.Ed. 684 (1886); U. S. v. One 1967 Cadillac, 453 F.2d 396 (C.A. 9, 1971)
 
 
 [5]
 This rule, now embodied in 19 U.S.C. 1615, has been the law at least since the Act of July 31, 1789, 1 St. 29, 43-44
 
 
 [6]
 Congress could, of course, provide for jury trial where none is required by the Constitution, but no such provision has been invoked by appellant in the case at bar
 
 
 [7]
 We could take judicial notice of the fact that the value of a Mercedes-Benz would "exceed twenty dollars" if the Amendment is applicable
 
 
 [8]
 The critical date when the Bill of Rights took effect is December 15, 1791, when the ratification of Virginia completed the process of adding the first ten amendments to the Constitution. The letters of Secretary of State Thomas Jefferson to the governors of the several States conveying official notice of this important event were dated March 1, 1792. Edward Dumbauld, The Bill of Rights and What It Means Today (1957, 2nd ed. 1963) 49-50. The date when legislative action in the Congress was completed is September 25, 1789. Ibid., 48
 
 
 [9]
 Thus a renowned legal scholar attempting to define equity wrote: "Equity now is that body of rules administered by our English courts of justice which, were it not for the operation of the Judicature Acts, would be administered by those courts which would be known as Courts of Equity . . . . Equity is a certain portion of our existing substantive law, yet in order that we may describe this portion and mark it off from other portions we have to make reference to courts that are no longer in existence. Still I fear that nothing better than this is possible." Frederic W. Maitland, Equity: Also, the Forms of Action at Common Law (1913) 1
 
 
 [10]
 Roscoe Pound, Jurisprudence (1959) I, 427; II, 417-21; William S. Holdsworth, A History of English Law (1938) XII, 258-85, 583-605
 
 
 [11]
 This principle was given statutory recognition in section 16 of the original Judiciary Act of September 24, 1789, 1 St. 73, 82
 
 
 [12]
 Ross v. Bernard, 396 U.S. 531, 539-40, 90 S.Ct. 733, 738-739, 24 L.Ed.2d 729 (1970)
 
 
 [13]
 Holdsworth, History of English Law (4th ed. 1931) I, 459-65
 
 
 [14]
 Ibid., 548-68. A statute of 1389 (13 Ric. II St. 1 c. 5) forbade the admiralty to "meddle from henceforth with anything done within the realm, but only of a thing done upon the sea;" and a statute of 1391 (15 Ric. II c. 3) denied jurisdiction within the body of a county. For comment on these statutes and the long conflict between admiralty and common law courts, see the erudite opinion of Justice Story in DeLovio v. Boit, Fed.Cas.No. 3,776, 2 Gall. 398 (Circuit Court, D.Mass.1815)
 
 
 [15]
 Genesee Chief v. Fitzhugh, 12 How. 443, 453-60, 13 L.Ed. 1058 (1851). Justice Daniel's dissent (ibid., 464-65) strongly supported interpretation of "admiralty . . . Jurisdiction" in Art. III sec. 2, cl. 1 of the Constitution as adopting the jurisdiction as then limited in England. He concurred, along with Justice Grier, in a lengthy and erudite dissent to the same effect by Justice Woodbury in Waring v. Clarke, 5 How. 441, 467-503, 12 L.Ed. 226 (1847). For comment on the controversy whether revenue seizures on water were an inherent or statutory feature of admiralty jurisdiction, see ibid., 455, 483 and note in The Sarah, 8 Wheat. 396-97, 5 L.Ed. 644. On this issue Justice Daniel (along with Justices Catron and Campbell) returned to the fray in Jackson v. Steamboat Magnolia, 20 How. 296, 307-310, 327-30, 15 L.Ed. 909 (1858). See also N. J. Steam Navigation Co. v. Merchants' Bank, 6 How. 344, 406-407, 12 L.Ed. 465 (1848)
 
 
 [16]
 The Daniel Ball, 10 Wall. 557, 563, 19 L.Ed. 999 (1871), and other cases cited in Dumbauld, The Constitution of the United States (1964) 339-41
 
 
 [17]
 It is important to stress the distinction between a "statutory proceeding" and a statutory right enforceable by a proceeding "in the nature of" a suit at common law. Rogers v. Loether, 467 F.2d 1110, 1115-17 (C.A. 7, 1972), aff'd sub nom. Curtis v. Loether, 415 U.S. 189, 193-97, 94 S.Ct. 1005, 1007-1009, 39 L.Ed.2d 260 (1974)
 
 
 [18]
 In connection with this case, attention should be drawn to the scholarly dissenting opinions of Judge Gibbons in the court below, sub nom. Frank Irey, Jr., Inc. v. Occupational Safety & H. R. Comm'n, 519 F.2d 1200, 1207, 1219 (C.A. 3, 1975)
 
 
 [19]
 Damsky v. Zavatt, 289 F.2d 46, 51 (C.A. 2, 1961). However, with respect to foreclosure of a tax lien on real estate the court held that jury trial was not required. Such relief was "an established head of equity jurisdiction well before 1791." Ibid., at 53
 
 
 [20]
 Hepner v. U. S., 213 U.S. 103, 105-108, 29 S.Ct. 474, 475-476, 53 L.Ed. 720 (1909)
 
 
 [21]
 "These cases uphold congressional power to entrust enforcement of statutory rights to an administrative process or specialized court of equity free from the strictures of the Seventh Amendment. But when Congress provides for enforcement of statutory rights in an ordinary civil action in the district courts, where there is obviously no functional justification for denying the jury trial right, a jury trial must be available if the action involves rights and remedies of the sort typically enforced in an action at law." 415 U.S. at 195, 94 S.Ct. at 1009. See also Pernell v. Southall Realty, 416 U.S. 363, 375, 383, 94 S.Ct. 1723, 1729-1733, 40 L.Ed.2d 198 (1974); and Kohl v. U. S., 91 U.S. 367, 375-76, 23 L.Ed. 449 (1875)
 
 
 [22]
 Charles W. Wolfram, "The Constitutional History of the Seventh Amendment," 57 Minn.L.R. 639-747 (1973), although conceding that the "historical test" has been uniformly accepted by the courts for at least a century and a half, favors instead a "dynamic" and flexible interpretation of the Seventh Amendment. See also Fleming James, Jr., "Right to a Jury Trial in Civil Actions," 72 Yale L.J. 655, 657-64 (1963); and Edith G. Henderson, "The Background of the Seventh Amendment," 80 Harvard L.R. 289, 336 (1966). Such historical inquiry is often "extensive and possibly abstruse" (Mr. Justice White in Ross v. Bernard, 396 U.S. 531, 538, 90 S.Ct. 733, 738, 24 L.Ed.2d 729 (1970)) as well as sometimes inconclusive (James, 72 Yale L.J. at 668)
 
 
 [23]
 While major emphasis is placed on English practice, because of the diversity among the states in development of the inherited English common law (see Justice Story's comment in U. S. v. Wonson, supra, and Alexander Hamilton's survey of state practice in No. 83 of The Federalist (H. C. Lodge ed. 1888) 523-25) it is proper not to exclude any consensus derivable from American practice; for it was in American courts that the rights existing in 1791, and "preserved" by the Seventh Amendment were to be enforced. Some cases refer loosely to "the settled rules of the common law . . . recognized in this country and England when the Constitution was adopted." Continental Bank v. Rock Island Ry., 294 U.S. 648, 669, 55 S.Ct. 595, 603, 79 L.Ed. 1110 (1935). This case comments on Waring v. Clarke cited in note 15, supra. Ibid., at 668-69, 55 S.Ct. at 602-03
 
 
 [24]
 See note 8, supra
 
 
 [25]
 Hence the thorough opinion of Judge Becker in Zenith Radio Corp. v. Matsushita Electric Industrial Co., 478 F.Supp. 889 (E.D.Pa.1979), is not pertinent to the issue involved in the case at bar although it contains extensive discussion of the Seventh Amendment. Ibid., 904-42
 
 
 [26]
 Robert K. Faulkner, The Jurisprudence of John Marshall (1968) xiii, 220; Edward Dumbauld, "John Marshall and the Law of Nations," 104 U. of Pa.L.Rev. (October, 1955), 38, 40; Albert J. Beveridge, The Life of John Marshall (1916-19) II, 195-96, IV, 119-20
 
 
 [27]
 Marshall here cited La Vengeance, 3 Dall. 297, 301, 1 L.Ed. 610 (1796) ("exportation of arms . . . is . . . a water transaction" hence a case of admiralty jurisdiction "of the nature of a libel in rem " not requiring a jury, since it was a civil case); The Sally, 2 Cranch 406, 2 L. Ed. 320 (1805) (affirmed without argument on authority of La Vengeance ); and The Betsey and Charlotte, 4 Cranch 443, 452, 2 L.Ed. 673 (1808) (Congress meant "to discriminate between seizures on waters navigable from the sea, and seizures upon land or upon waters not navigable, and to class the former among the civil causes of admiralty and maritime jurisdiction")
 
 
 [28]
 1 Stat. 73. See Felix Frankfurter and James M. Landis, The Business of the Supreme Court (1927) 4
 
 
 [29]
 On the following day, it will be remembered, the same Congress completed its consideration of the Seventh Amendment. See note 8, supra. Hence the contemporaneous interpretation of the Amendment by its framers, as embodied in the terms of the Judiciary Act, is of great weight
 
 
 [30]
 Was the omission of "equity" here (though found in section 12, see note 31, infra ) an inadvertent oversight? See Wolfram, "The Constitutional History of the Seventh Amendment," 57 Minn.L.R. (June, 1973), 639, 713 n.203. Or was it a negative pregnant permitting jury trials in equity cases (e. g., an equity suit against a vice-consul) as in Texas (ibid., 733) and in Virginia under legislation drafted by Thomas Jefferson but later repealed as "being found inconvenient?" 9 Hening, The Statutes at Large . . . of Virginia (1821) 394; 3 Tucker's Blackstone's Commentaries (1803) App. 56; Dumbauld, Thomas Jefferson and the Law (1978) 152, 250 n.103. (This interpretation seems improbable in view of Charles Warren's discovery that the Senate inserted, but later deleted, an amendment to the draft bill requiring jury trial in all suits in equity. Warren, "New Light on the History of the Federal Judiciary Act of 1789," 37 Harv.L.R. (November, 1923) 49, 78-79, 99.) Or was it because no jurisdiction in equity was conferred by the terms of section 9? Ibid., 75 n.60: "the District Court was given no equity powers."
 
 
 [31]
 The section also conferred criminal jurisdiction of "all crimes . . . cognizable under the authority of the United States;" of suits by an alien "for a tort only in violation of the law of nations or a treaty of the United States;" of suits at common law by the United States for over $100; and of suits against consuls or vice-consuls, "except for offences above the description aforesaid." Section 11 gave the circuit courts, in addition to certain criminal and appellate jurisdiction, original cognizance of "all suits of a civil nature at common law or in equity" where $500 was involved, and the United States, an alien, or a citizen of another State is a party. 1 Stat. 78-79. Section 12 provides that "the trial of issues in fact in the circuit courts shall, in all suits, except those of equity, and of admiralty, and maritime jurisdiction, be by jury." 1 Stat. 80. Section 13 provides: "And the trial of issues in fact in the Supreme Court, in all actions at law against citizens of the United States, shall be by jury." 1 Stat. 81
 
 
 [32]
 An Act to regulate the Collection of the Duties imposed by law on the tonnage of ships or vessels and on goods, wares and merchandises imported into the United States, 1 Stat. 29, became law on July 31, 1789. The Department of State (denominated the Department of Foreign Affairs) had already been established on July 27, 1789, 1 Stat. 28. The Department of War was established on August 7, 1789, 1 Stat. 49; the Department of Treasury on September 2, 1789, 1 Stat. 65; the Post Office on September 22, 1789, 1 Stat. 70. The Judiciary Act became law on September 24, 1789, 1 Stat. 73, and in section 35 provided for appointment of the Attorney General (ibid., 93)
 
 
 [33]
 Substantially similar procedures were elaborated in section 67 of the Act of August 4, 1790, 1 Stat. 176, and sec. 89 of the Act of March 2, 1799, 1 Stat. 695. Wood v. U. S., 16 Pet. 342, 362, 10 L.Ed. 987 (1842), involved a jury trial for forfeiture of 22 pieces of cloth imported by use of false invoices, and seized upon land for violation of section 66 of the Act of March 2, 1799, 1 St. 677
 
 
 [34]
 The language "prosecuted as aforesaid " would seem to indicate a legislative intent that forfeitures should be tried in the same manner as penalties, namely, by jury. Hepner v. U. S., 213 U.S. 103, 107, 29 S.Ct. 474, 476, 53 L.Ed. 720 (1909)
 
 
 [35]
 1 Stat. 43-44. See also sections 49 and 67 of the 1790 act, 1 Stat. 173, 176; and sections 71 and 89 of the 1799 act, 1 Stat. 678, 695-96. Section 71 of the 1799 act adds "but the onus probandi shall lie on the claimant only where probable cause is shown for such prosecution, to be judged of by the court before whom the prosecution is had." 1 Stat. 678
 
 
 [36]
 Julius Goebel, Antecedents and Beginnings to 1801 (1971) 86; Richard L. Perry, Sources of Our Liberties (1959) 288
 
 
 [37]
 In N. J. Steam Navigation Co. v. Merchants' Bank, 6 How. 344, 389, 12 L.Ed. 465 (1848), the constitutionality of the act was treated by the court as settled by the cases cited by Marshall. See note 38, infra
 
 
 [38]
 See note 27, supra
 
 
 [39]
 Charles Warren, The Supreme Court in United States History (1922), I, 149-50
 
 
 [40]
 See note 15, supra
 
 
 [41]
 See note 27, supra. This was the first case to come before Oliver Ellsworth as Chief Justice. He was particularly well fitted to deal with admiralty matters, having been a member of the standing Committee on Appeals established by the Continental Congress, which heard the cause celebre involving Gideon Olmsted and the sloop Active. Charles Warren, The Supreme Court in United States History (1922) I, 149; Henry J. Bourguignon, The First Federal Court (1977) 104, 329; William G. Brown, The Life of Oliver Ellsworth (1905) 188; Edward Dumbauld, "The Case of the Mutinous Mariner," Supreme Court Society Yearbook 1977, 52-58. Ellsworth was also the chief draftsman of the Judiciary Act of 1789
 
 
 [42]
 4 Cranch at 446. Justice Chase retorted "I recollect, that the argument was no great thing, but the court took time and considered the case well. The reason of the legislature for putting seizures of this kind on the admiralty side of the court was, the great danger to the revenue, if such cases should be left to the caprice of juries." This resembles the policy of Parliament in extending the powers of admiralty courts in America "beyond their ancient limits." This was "the most effective, and therefore the most disliked" of all the methods adopted to enforce the acts of trade "because it deprived the defendant of the right to be tried by a jury which was almost certain not to convict him." Holdsworth, A History of English Law (1938) XI, 110. See note 44, infra and Justice Campbell's comment in the Magnolia case, 20 How. at 328-29
 
 
 [43]
 4 Cranch 443, 447-51 (1808)
 
 
 [44]
 Ibid., 4 Cranch at 448. The point is elaborated in Justice Woodbury's dissent in Waring v. Clarke, 5 How. at 483. For Justice Wayne's treatment of the subject in the majority opinion see 5 How. at 455. See note 15, supra
 
 
 [45]
 4 Cranch at 447, 448. Similarly in DeLovio v. Boit, Fed.Cas.No. 3,776, 2 Gall. 398 (1815), Justice Story said that "it is perfectly clear, that congress have no authority to include cases within the admiralty jurisdiction, which the terms of the constitution did not warrant." 7 Fed.Cas. at 443
 
 
 [46]
 4 Cranch at 449. Marshall responded that if that was the meaning intended by Congress a very awkward mode of expressing it had been employed. Ibid., at 452
 
 
 [47]
 "The question, then, is, whether, according to the understanding of the people of this country at that time, a seizure of a vessel, within the body of a county, for breach of a municipal law of trade, was a case of admiralty cognizance. It certainly was never so considered in England. . . . All seizures in that country, for violation of the laws of revenue, trade or navigation, are tried by a jury in the court of exchequer, according to the course of the common law. There is nothing in the course of proceedings in rem which requires that they should be in a court of admiralty. A court of common law is as competent to the trial of such cases, as a court of admiralty." 4 Cranch at 447-48. See also Justice Woodbury's description of the English practice in Waring v. Clarke, 5 How. at 483
 
 
 [48]
 As stated by Chief Justice Stone in Hendry (318 U.S. at 151-52, 63 S.Ct. at 509-510), the widely read treatises of Blackstone and Chancellor Kent described the trial of forfeitures by jury in the Court of Exchequer, according to the course of the common law, in an in rem proceeding. See Blackstone, Commentaries, III, 262. With respect to forfeitures upon conviction of treason or felony, Blackstone (ibid., 259) says: "For it is a part of the liberties of England, and greatly for the safety of the subject, that the king may not enter upon and seize any man's possessions upon bare surmises without the intervention of a jury." M. H. Smith, The Writs of Assistance Case (1978) 11-15, describes the English practice of jury trial of forfeiture cases in the Exchequer, and how acts of Parliament beginning in 1696 authorized admiralty trials without a jury in the Colonies (ibid., 14). This "discrimination between subjects in the provision limiting suits in England to common law courts" was resented in America. Julius Goebel, Antecedents and Beginnings to 1801, vol. I of Holmes Devise History of the Supreme Court of the United States (1971) 85-87
 
 
 [49]
 Not only did the Declaration of Independence castigate King and Parliament "For depriving us, in many cases, of the Benefits of Trial by Jury," but the offensive legislation to "extend the powers of the admiralty courts beyond their ancient limits" was denounced by the resolutions of October 14, 1774, of the first Continental Congress (Journals (W. C. Ford ed. 1904) I, 74), as well as by remonstrances of the Massachusetts house of representatives of October 23, 1765, June 29, 1769, and July 5, 1771 (Massachusetts State Papers, (Alden Bradford ed. 1818) 47, 179, 307). See also Edward Dumbauld, The Declaration of Independence and What It Means Today (1950; 2nd ed. 1968) 116-17, 132-33
 
 
 [50]
 It is not certain whether Adams actually made this argument in court, or whether it was used for publicity purposes to arouse public sentiment. L. Kinvin Wroth and Hiller B. Zobel, The Legal Papers of John Adams (1965) II, 191-92. The case to which it relates was an action in personam against Hancock filed October 29, 1768, for a penalty of 9,000, treble the value of the goods, under section 37 of the Sugar Act. Ibid., 181, 195. His sloop Liberty had already been forfeited on August 17, 1768, under a libel filed June 22, 1768, in another proceeding. Ibid., 177-78
 
 
 [51]
 Ibid., 199-200
 
 
 [52]
 Ibid., 190. See also Goebel, loc. cit. note 48, supra. In the Instructions of the town of Boston to their representatives of May 15, 1769, Adams substantially repeats the language of his argument for Hancock, and adds: "It would be thought in England a dangerous innovation, if the trial of any matter upon land was given to the admiralty." The Works of John Adams (C. F. Adams ed. 1850-56) III, 508 (The date of 1768 is given by Justice Campbell in 20 How. at 330.)
 
 
 [53]
 Warren, "New Light on the History of the Federal Judiciary Act of 1789," 37 Harv.L.R. (November, 1923), 49 at 74-75 (Italics supplied). This article was relied on by the Supreme Court in deciding Erie R. R. Co. v. Tompkins, 304 U.S. 64, 72-73, 58 S.Ct. 817, 819, 82 L.Ed. 1188 (1938)
 
 
 [54]
 The same severe rule applies in American law, as pronounced by Story and Marshall. U. S. v. Brig Malek Adhel, 2 How. 210, 233-34, 11 L.Ed. 239 (1844). See note 2, supra
 
 
 [55]
 These references to Exchequer cases selected at random from the reports were furnished by the courtesy of Edith G. Henderson, curator of the Treasure Room at the Harvard Law School Library
 
 
 [56]
 The resemblance of this ruling to that in Damsky v. Zavatt, cited in note 19, supra, is striking
 
 
 [57]
 The law declared that "any property of whatsoever kind" used in abetting the rebellion was the "lawful subject of prize and capture wherever found;" and that "such prizes and capture shall be condemned in the district or circuit court of the United States having jurisdiction of the amount, or in admiralty in any district in which the same may be seized, or into which they may be taken and proceedings first instituted." The confiscation act of July 17, 1862, 12 Stat. 589, provided in section 7 (12 Stat. at 591) that "proceedings in rem shall be instituted . . . which proceedings shall conform as nearly as may be to proceedings in admiralty or revenue cases." Similar language is found in 28 U.S.C. 2461 (applicable in the absence of other specific provisions) that "in cases of seizures on land the forfeiture may be enforced by a proceeding by libel which shall conform as near as may be to proceedings in admiralty." In the case at bar, 21 U.S.C. 881(b) and (d) would govern, which incorporate provisions relating to "violations of the customs laws." 49 U.S.C. 784 contains similar provisions applicable to violations of 49 U.S.C. 782. Assimilation to admiralty merely requires a "libel" rather than a "complaint" as the initial pleading. Thereafter the case is treated as an action at common law, in which a jury trial is a constitutional right. Reynal v. U. S., 153 F.2d 929, 931 (C.C.A. 5, 1945); Vandevander v. U. S., 172 F.2d 100, 101 (C.A. 5, 1949)
 
 
 [58]
 In criminal cases exclusion of jury trial has been limited to "petty offenses," usually understood as those involving punishment of not more than six months or $500. See Dumbauld, The Constitution of the United States (1964) 369-70; Felix Frankfurter and Thomas G. Corcoran, "Petty Federal Offenders and the Constitutional Guaranty of Trial by Jury," 39 Harv.L.R. (June, 1926), 917-1019; District of Columbia v. Clawans, 300 U.S. 617, 627-29, 57 S.Ct. 660, 663-64, 81 L.Ed. 843 (1937); Cheff v. Schnackenberg, 384 U.S. 373, 379, 86 S.Ct. 1523, 1525, 16 L.Ed.2d 629 (1966); 18 U.S.C. 1
 
 
 [59]
 "The framers all seem to have agreed that trial by jury could be traced back in an unbroken line to the provision in Magna Charta in which King John guaranteed trial by one's peers. . . . Historians no longer accept the Magna Charta pedigree for jury trial." Wolfram, "The Constitutional History of the Seventh Amendment," 57 Minn.L.R. (March, 1973) 639, 653. See also William S. McKechnie, Magna Carta (2nd ed. 1914), 134, 376, 392-93. The phrase in the Charter refers to the "peers" of a tenant who were the other tenants of his feudal lord who composed the lord's "Court Baron." Ibid., 378
 
 
 [60]
 3 Bl.Com. 379. The popularity of Blackstone in the Colonies was commented on by Edmund Burke in his 1775 speech on conciliation with America. A. E. Dick Howard, The Road from Runnymede (1968) 131-32
 
 
 [61]
 Parsons v. Bedford, 3 Pet. 433, 446, 7 L.Ed. 732 (1830). Story's extrajudicial writings also contain praise of the jury system. In his Commentaries on the Constitution he traced trial by jury to Magna Carta and said that it was brought to America as one of the rights of Englishmen claimed by the colonists. Howard, op. cit. note 60, supra, 343. On another occasion he exclaimed: "Where is to be found a nobler institution than the trial by jury, that impregnable bulwark of civil liberty?" The Miscellaneous Writings . . . of Joseph Story (1835) 19